UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/3/16

STANACARD, LLC,

    Plaintiff,

    -against-

12 Civ. 5176

RUBARD, LLC, et al.,

    Defendants.

_____ x

## MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

McMahon, J.:

Plaintiff Stanacard, LLC ("Stanacard") provides long-distance telephone services to customers. Defendants Artur Zaytsev and Aleksandr Palatkevich once worked for Stanacard. After the termination of their respective employment arrangements with Stanacard, Zaytsev formed Defendant Rubard, LLC ("Rubard") and served as its chief operating officer. Doing business as CentMobile, Rubard competes with Stanacard in the long-distance telephone services business. Palatkevich wrote the source code for CentMobile's telephone service.

Stanacard here sues Rubard, Zaytsev, Palatkevich and Alexander Dzerneyko, Rubard's majority investor. The gravamen of the complaint is that all Defendants, at one time or another, directly or indirectly infringed Stanacard's patent (U.S. Patent No. 7,346,156, or the " '156 patent") and copyright in certain long distance call methodology and systems. Stanacard also alleges that all defendants misappropriated Stanacard's trade secrets, and that Zaytsev and

1

Palatkevich breached their work-for-hire, confidentiality and non-compete agreements with, and the fiduciary duties they owed to, Stanacard.

In a Decision and Order dated November 18, 2015, the Court granted Defendants' motion for partial summary judgment invalidating the '156 Patent, which covered a method for routing long distance calls, on the ground that the claims in suit were directed to unpatentable matter and failed to incorporate any "inventive concept." *See* Docket No. 244. This decision disposed of Plaintiff's patent infringement claim (Count 1).

Facts relevant to the remaining claims are set forth below. Additional background about the employment history of Zaytsev and Palatkevich can be found in the Court's Decision and Order disposing of a motion for summary judgment in another case involving Palatkevich and Zaytsev, *Palatkevich et al v. Choupak et al,* No. 12-cv-1691 (the "Choupak Case"), Docket No. 150 (the "Choupak SJ Order"). I assume the parties' familiarity with that decision.

### Defendants' Work History at Stanacard and the NDAs

Palatkevich, through his wholly owned business venture BPVN, Inc., provided technical expertise and software services to Stanacard from May 2006 until July 2009. Local Rule 56.1 Statement of Undisputed Material Facts In Support of Defendant A. Palatkevich's Motion for Partial Summary Judgment ("Palatkevich 56.1") ¶ 3. Palatkevich wrote the code for Stanacard's operating systems as well as its compression and anti-fraud software, referred to in the complaint as the "Stanacard Copyrighted Works." *Id.* ¶ 6; *see* Compl. ¶ 13.

The parties agree that Palatkevich was an independent contractor and not a Stanacard employee. *Id.* ¶ 11; Plaintiff's Response to Palatkevich's Statement of Material Facts ("Pl.'s Counter to Palatkevich 56.1") ¶ 11.

On January 9, 2009, long after he began coding for Stanacard, Palatkevich was asked to sign a Non-Disclosure, Work-for-Hire, Non-Compete Agreement ("NDA"). *See* Compl. Ex. C. He did so. He also executed a substantively identical agreement on behalf of BPVN. *See id;* Krol Decl. Ex. 2. Palatkevich's NDA, though signed in January 2009, was back-dated to March 20, 2007 (the "Effective Date"). The BPVN NDA was back-dated to July 21, 2008. The parties do not explain why there is a difference.

The NDAs contain various restrictive covenants, including covenants related to conflicts of interest, non-competition, and non-solicitation/non-disparagement. In pertinent part, the non-competition clause states that "Individual agrees that during the term the Relationship [sic] and for a period of one (1) year following the conclusion of the Relationship (the "Restrictive Period") ... Individual will not participate or engage in ... any business that directly or indirectly competes (or is preparing to compete) with the Company." Compl. Ex. C ¶ 5.

The NDA also contains an "Inventions and Work-for-Hire" clause, relied upon by Plaintiff for its copyright infringement claim, which reads as follows:

> Individual agrees *that prior to and during the Relationship, any and all inventions*, discoveries, innovations, improvements, trade secrets, designs, drawings, business processes, strategies and secret processes, whether or not patentable, which may be created, conceived, developed or made, and related or in any way connected with Company, its strategic plans, products, services, patents and patent applications, processes, apparatus or business now or hereafter carried on by Company (collectively, "Inventions"), *shall be the sole and exclusive property of Company as against Individual.* Individual shall immediately disclose to Company all Inventions with respect to Company conceived of, developed, or made by Individual. Whether during or after the Relationship, Individual further agrees to execute and acknowledge all papers and to do, at Company's expense, any and all other things necessary for or incident to the applying for, obtaining, and maintaining of such letters patent, copyrights, trademarks or other intellectual property rights, as the case may be, and to execute, on request, all papers necessary to assign and transfer such inventions, improvements, designs, discoveries, writings, copyrights, patents, patent applications and other intellectual property rights to Company, its successors and assigns. In the event that Company is unable, after reasonable effort and in any event, after five business days, to secure Individual's signature ... Individual irrevocably designates and appoints the Manager as

3

> Individual's attorney-in-fact to act on Individual's behalf to execute and file any such applications and to do all lawfully permitted acts to further the prosecution or issuance of such assignments, letters patent, copyright, or trademark.

Compl. Ex. C ¶ 6(a) (emphasis added). Plaintiff alleges that, pursuant to that Inventions and Work-for-Hire clause, all code, systems, etc. created by Palatkevich during the period when he was affiliated with the company belonged to Stanacard. Compl. ¶ 15. To give effect to this ownership claim, Stanacard applied for registration of a copyright in its source code – developed by Palatkevich – on July 2, 2012, the same day it filed the Complaint in this action. Compl. ¶ 13.

Zaytsev worked for Stanacard from September 2007 to November 2009; he held himself out as Stanacard's CFO and his responsibilities were financial in nature. Local Rule 56.1 Statement of Undisputed Material Facts In Support of Defendants' Motion for Partial Summary Judgment ("Rubard 56.1") ¶¶ 10, 11; Compl. ¶ 6. There is no indication that the parties considered him to be an independent contractor; he was an employee.

On January 9, 2009 Stanacard's CEO, Anastasia Koroleva, asked Zaytsev to sign a Non-Disclosure, Work-for-Hire, and Non-Compete Agreement. Zaytsev's agreement is identical in all material respects to the NDA Palatkevich signed. *See* Compl. Exs. C, D. Koroleva also gave Zaytsev a Joinder Agreement, which he also signed; the Joinder Agreement indicated that Zaytsev had a 10% interest in Stanacard. Rubard 56.1 ¶¶ 14-16.

On January 29, 2009, Michael Choupak, Stanacard's majority owner, sent Zaytsev a revised NDA and asked that he sign it in lieu of the NDA previously sent by Koroleva. *Id.* ¶¶ 17-19.

Whether Zaytsev actually owns 10% of Stanacard is in dispute; that issue, along with several others, arises in the Choupak Case and will be tried this coming April. The issue is irrelevant here except insofar as Zaytsev believes that the stock award served as consideration for his signing the NDA.

Both Palatkevich and Zaytsev left Stanacard in 2009.

Palatkevich resigned in July 2009, after Choupak sought to reduce his compensation significantly. Stanacard had been paying BPVN $30,000 per month; Choupak wanted to reduce that to $150,000 per year. On June 26, 2009, Choupak emailed Palatkevich:

> Privet[1] Alik,
>
> Unfortunately I have some bad news for you. We're running a deficit- losing money on the monthly basis across all business to the tune of 200K per month. I have to take some drastic measures and let some people go and cut expenses here and there while trying to return to profitability that may take several months.
>
> Here's what I have in mind as far as your situation. When we originally started working on Stanacard we negotiated 30K per month for your services, Volkov's services and office space. Sine [sic] we don't have Volkov and have an office space of our own (Stanacard) I propose bringing down your monthly fee to the level that we pay Edik Romanov mainly [sic] 150K per year corp to corp starting July first.
>
> If the situation improves in the future or Stanacard begins generating more profit- we will revisit this arrangement.
>
> Sorry for such a short notice but we're really hurting.
>
> -michael

Krol Decl. Ex. J. Palatkevich would not accept the reduced compensation; on July 6, 2009, he advised Stanacard that he would no longer work for it. Kohen Decl. Ex. C.

In the fall of 2009, following Palatkevich's departure, the relationship between Choupak and Zaytsev became increasingly fraught. Choupak repeatedly berated Zaytsev for poor job performance, including for his failure to provide weekly reports of his activities. *See* Choupak Decl. Ex. A. Zaytsev was fired in November 2009. In an email with the subject "We're parting ways at work," Choupak offered no particular reason for the termination; he simply wrote, "Dear

---

[1] Privet is a Russian greeting equivalent to "hello." *See* http://www.urbandictionary.com/define.php?term=privet (last accessed January 12, 2016).

Arthur [sic], We will not be able to work together. This is your 2 week notice. Kindly wrap up everything over the next 2 weeks. Your last day is Dec 4th. Effective immediately you don't need to show up at the office unless absolutely necessary and only to transfer work to Dan NG and Sean Alcoba. Sincerely, - michael." Zaytsev Decl. Ex. D; Rubard 56.1 ¶ 23.

### Rubard / CentMobile

Rubard is a Delaware limited liability company with its principal place of business in New York. Rubard 56.1 ¶¶ 35-37. Rubard does business as CentMobile. Compl. ¶ 7. Like Stanacard, CentMobile offers long-distance telephone services; it is a significant competitor of Stanacard's. *See id.* ¶¶ 26, 47. Both Stanacard and CentMobile operate as follows: a subscriber is assigned a local telephone number, which is connected via the Stanacard or CentMobile system to a long-distance telephone number that the subscriber wants to call. When the subscriber dials that local number, the Stanacard or CentMobile system recalls the long-distance number affiliated with the local number and connects the subscriber to the long-distance number. *Id.* ¶ 27; Rubard Def. 56.1 ¶ 1.

The parties disagree about when, precisely, CentMobile commenced operations. The Court gleans the following relevant dates from the record:

Palatkevich registered the CentMobile.com domain name in July 2009 – the same month in which he ended his relationship with Stanacard. He waited until September 2010 to begin developing the CentMobile website and to begin a trial of CentMobile.com services, which were not offered to the public. Krol Decl. Ex. A.

Just as his one year non-compete period was drawing to a close, Zaytsev joined forces with Palatkevich, and on December 9, 2010, Zaytsev incorporated Rubard LLC d/b/a CentMobile. Krol Decl. Ex. A; Rubard 56.1 ¶ 39. Zaytsev currently serves as the Chief

Financial Officer and Chief Operating Officer of Rubard. Rubard 56.1 ¶ 41. The Rubard LLC Agreement establishes Zaytsev as the sole "Manager;" he is "responsible for the operation and management of the business and affairs of the Company...." Krol Decl. Ex. F.

Rubard was financed by one Alexander Dzerneyko. As of December 2010, Dzerneyko had received a 10% interest in Rubard in exchange for a capital contribution of $250,000. Krol Decl. Ex. F. An LLC Membership Interest Purchase Agreement, executed in February 2011, increased Dzerneyko's ownership interest to 90.1%, although he increased his investment by only $10. Rubard 56.1 ¶ 43; Krol Ex. G.

Dzerneyko is not employed by Rubard and does not have – nor has he ever had – any management responsibility for running Rubard. He is a passive investor. Rubard 56.1 ¶¶44-48.[2]

In April 2011, the newly formed corporation obtained a "merchant account" to process customer payments and began offering its internet telephone services to the public.[3] Krol Decl. Ex. A; Rubard 56.1. ¶ 57.

Once Rubard/CentMobile commenced operations, it began actively competing with Stanacard; according to the Complaint, customers have "abandon[ed] Stanacard in droves and switch[ed] to CentMobile." Compl. ¶ 47. Stanacard believes this is because Palatkevich and Zaytsev, who had previously been affiliated with Stanacard, were using Stanacard's copyrighted code and its trade secrets, in breach of the NDAs they had signed while affiliated with Plaintiff.

---

[2] Under Local Rule 56.1, facts provided by Defendants in their 56.1 statement that Stanacard fails to dispute with a citation to the record are deemed admitted. Stanacard failed to dispute these facts with any citation to the record, and, as such, they are deemed admitted.

[3] Stanacard insists that as of September 2010 CentMobile offered services to the public. Stanacard Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Pl. Opp. to Rubard") at 5-6; Krol Ex. B. This fact is therefore disputed, but whether the September 2010 to April 2011 time period constitutes a "trial period" or the offering of services to the public is irrelevant for the purposes of this motion.

## Stanacard's Claims

Stanacard files its complaint on July 2, 2012. In addition to the now-dismissed patent infringement claim (Count 1), Stanacard asserts the following claims:

- Count 2: Copyright Infringement – asserted against all Defendants for the alleged reproduction, loan, or lease of the so-called Stanacard Copyrighted Works, Compl ¶¶ 31-37;

- Count 3: Unfair Competition and Misappropriation of Trade Secrets – asserted against all Defendants on the grounds that Palatkevich allegedly wrongfully took trade secrets relating to rate information, Stanacard's marketing program, customer list, management console, and carrier contact names upon his departure from Stanacard, for use at CentMobile, *see* Compl ¶¶ 43-48;

- Counts 4 and 5: Breach of Contract – against Palatkevich and Zaytsev, respectively, for alleged breach of the NDAs, for the aforementioned conduct, Compl. ¶¶ 49-56;

- Counts 6 and 7: Breach of Fiduciary Duty – against Palatkevich and Zaytsev, respectively, for forming the competitor CentMobile. Plaintiff also alleges that while at Stanacard, Zaytsev "neglected his duties, failed to show up for work, failed to make the requisite corporate filings on time, failed to control accounts payable, denied access to financial data to Stanacard's CEO, and bought personal items … for himself and for Palatkevich" using company credit cards, Compl. ¶¶ 57-66;

- Count 8: Unfair Competition and Misappropriation of Trade Secrets under the Delaware Uniform Trade Secrets Act (the "DUTSA") – against all Defendants for

the alleged misappropriation of trade secrets, in violation of Delaware Law, Compl. ¶¶67-73;

- Count 9: Conversion – against all Defendants, for allegedly utilizing Stanacard copyrighted works and trade secrets at CentMobile, Compl. ¶¶ 74-77;

- Count 10: Unjust Enrichment (alleged in the alternative) – asserted against all Defendants for the same conduct.

Stanacard seeks money damages and a permanent injunction prohibiting Defendants from using Stanacard's copyrighted works at CentMobile. Compl. at 17-19.

Defendants have filed three separate motions for summary judgment. The first, which the Court has already granted, sought to invalidate Plaintiff's patent. *See* Docket No. 244.

The second was filed by Rubard, Zaytsev, and Dzerneyko (collectively, the "Rubard Defendants") on August 21, 2015. They seek partial summary judgment dismissing the claims against Zaytsev and Dzerneyko and dismissing the claims for unfair competition, misappropriation of trade secrets, conversion, and unjust enrichment (Counts Three, Eight, Nine, and Ten) as against Rubard as well. *See* Memorandum of Law in Support of the Rubard Defendants' Motion for Partial Summary Judgment ("Rubard Br."). The Rubard Defendants also seek a ruling that statutory damages, enhanced damages, and attorneys' fees for plaintiff's copyright claim cannot be awarded as a matter of law. *Id*. at 11-13.

On August 22, 2015, Palatkevich moved separately for partial summary judgment dismissing the copyright claim; in his brief he also adopted the Rubard Defendants' arguments. *See* Memorandum of Law in Support of Motion for Partial Summary Judgment By Defendants Aleksandr Palatkevich ("Palatkevich Br.").

9

For the reasons set forth below, Defendants' motions for summary judgment are granted in part and denied in part.

## DISCUSSION

### I.    Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  In addressing a motion for summary judgment, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion" and the court must draw all reasonable inferences in its favor. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986).  "Once this burden has been met, the nonmoving party may not merely rest upon the allegations in the pleadings, 'but must set forth specific facts showing that there is a genuine issue for trial.'" *Levitin v. Miller*, 92-CV-520 (KMW), 1994 WL 376078, at *2 (S.D.N.Y. July 15, 1994) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).  If the non-moving party fails to address an undisputed fact asserted by the moving party, "the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).  In demonstrating the existence of disputed issues of fact, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998), and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Industries Co.*, 475 U.S. at 586.

## II.    Summary Judgment Dismissing Count Two Is Denied

Palatkevich moves to dismiss Stanacard's copyright infringement claim.  He argues that Stanacard does not own the copyright in the software he wrote because it was not a "work for hire" within the meaning of the Copyright Act and that the NDA he signed – which purports to give Stanacard ownership of any and all of Palatkevich's work product for Stanacard – is invalid.

### A.    Law of the Case

In the Choupak Case, Palatkevich alleged that Choupak and Stanacard had infringed his copyright in certain specific programs he had coded while under contract with Stanacard. *See* Choupak Case Amended Consolidated Complaint, 12-cv-1681, Docket No. 19 at ¶¶ 198-212.  I granted Choupak's motion to dismiss, because from the face of that pleading (including the text of the NDA, which was incorporated by reference into the Amended Consolidated Complaint), it appeared that Palatkevich had assigned any copyright he might have had in work created for Stanacard to Stanacard via the NDA. *See* Memorandum Decision and Order Granting in Part and Denying in Part Defendants' Motion to Dismiss the Amended Consolidated Complaint, 12-cv-1681, Docket No. 46 ("Choupak Motion to Dismiss") at 13-17.  Palatkevich never sought leave to replead his copyright claim, and the Court's interlocutory decision dismissing some but not all of the claims in suit could not be appealed.

Stanacard argues that the Court's decision on the Motion to Dismiss precludes Palatkevich from relitigating the issue of copyright ownership in this separate action. Stanacard invokes the "law of the case" doctrine.  But this case is not the same case as the Choupak Case, nor are the parties identical.  The doctrine of law of the case applies only to the particular case in which a ruling is made – or, less frequently, to cases that involve exactly the same parties. *See In re PCH Associates*, 949 F.2d 585, 592 (2d Cir. 1991).

11

Stanacard also argues that Palatkevich is collaterally estopped from relitigating the issue. Collateral estoppel "precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party ... whether or not the tribunals or causes of action are the same." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir. 1995) (internal quotation marks and citation omitted). "The bar of issue preclusion applies only if: (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits. *In re PCH Associates*, 949 F.2d at 593.

Here, the issues in the two relevant proceedings are not identical. While the overarching question of who owns the copyright in Stanacard's code is the same, various issues – namely, the validity of the NDA – were not litigated in the Choupak Case and the Court did not have an opportunity to consider them there. Further, the interpretation of the NDA in the Choupak Motion to Dismiss was not "necessary to support a valid and final judgment on the merits." The dismissal of Palatkevich's copyright claim was based first and foremost on his failure to register the copyrights at issue. The NDA simply afforded an additional basis for dismissing the claim; it was not a necessary component of that decision. *See* Choupak Motion to Dismiss at 12-13.

Finally, Stanacard also briefly invokes judicial estoppel. In the Second Circuit, the elements of estoppel are that (1) "the party against whom the estoppel is asserted must have argued an inconsistent position in a prior proceeding;" and (2), "the prior inconsistent position must have been adopted by the court in some manner." *Bates v. Long Island R. Co.*, 997 F.2d 1028, 1038 (2d Cir. 1993). Obviously, Palatkevich's argument that Stanacard does not own the

copyrights at issue is entirely consistent with his own prior claim to ownership. Judicial estoppel does not bar this Court's consideration of Palatkevich's arguments here.

I will, therefore, evaluate Palatkevich's arguments in the context of this motion for summary judgment, which rests on an evidentiary record.

**B.    Work-for-Hire Under 17 U.S.C. § 101**

Palatkevich first argues that Palatkevich's work for Stanacard is not a "work-for-hire" within the meaning of the Copyright Act.

17 U.S.C. § 101 provides that a work for hire is:

> (1) a work prepared by an employee within the scope of his or her employment; or
>
> (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. For the purpose of the foregoing sentence, a "supplementary work" is a work prepared for publication as a secondary adjunct to a work by another author for the purpose of introducing, concluding, illustrating, explaining, revising, commenting upon, or assisting in the use of the other work, such as forewords, afterwords, pictorial illustrations, maps, charts, tables, editorial notes, musical arrangements, answer material for tests, bibliographies, appendixes, and indexes, and an "instructional text" is a literary, pictorial, or graphic work prepared for publication and with the purpose of use in systematic instructional activities.

The parties agree that Palatkevich was an independent contractor, *see* Pl.'s Counter to Palatkevich 56.1 ¶ 11, and Stanacard does not argue that § 101(1) applies to Palatkevich's work. Stanacard's Memorandum in Opposition to Palatkevich's Motion for Summary Judgment ("Pl. Opp. to Palatkevich") at 5.

The question, then, is whether 17 U.S.C. § 101(2) renders Palatkevich's software a work-for-hire, because:

(1) the work was specially ordered or commissioned by Stanacard,

(2) the work falls into one of the nine categories enumerated in 101(2), and

(3) the parties expressly agreed in a written instrument that the work is a work-for-hire.

The Second Circuit has held that the "specially ordered and commissioned" requirement of § 101(2) is satisfied if the ordering/commissioning party – here, Stanacard – was the "motivating factor" behind the creation of the work at issue. *Playboy Enterprises, Inc. v. Dumas*, 53 F.3d 549, 562-63 (2d Cir. 1995). Stanacard retained Palatkevich precisely because it needed new and better software; plainly, Stanacard was the motivating factor behind the creation of the source code, which Palatkevich wrote to be implemented in Stanacard's business and which Stanacard paid him to create. Palatkevich does not argue otherwise. Indeed, in his affidavit, Palatkevich acknowledges that he was tasked with working on a system that "wasn't designed properly" and "failed routinely;" thus, he "began [his] programming from scratch" and wrote a "new code" for the company. Kohen Decl. Ex. 1. It is also undisputed that, while he was creating this code, he was paid $30,000, each and every month, by Stanacard. The first requirement is easily satisfied.

On its face, the second requirement seems problematic. None of the nine enumerated categories obviously encompasses computer programs, software, or code and Stanacard, (unhelpfully) fails to specify which of the nine categories applies to the Stanacard source code.

Fortunately for Stanacard, courts have held that computer programs used together as a software system qualify as "compilations" or "collective works" within the meaning of § 101(2).

In *Logicom Inclusive, Inc. v. W.P. Stewart & Co.*, No. 04 CIV. 0604 (CSH), 2004 WL 1781009, at *8-9 (S.D.N.Y. Aug. 10, 2004), my colleague Judge Haight, analyzing whether two software programs developed by an independent contractor for a financial services firm were works for hire within the meaning of § 101(2), held that "nonliteral elements of a computer

14

program are properly considered a 'compilation' insofar as the concepts of selection, arrangement and organization, central to the compilation doctrine, are included in the analysis of a computer program's structure." And in *IXL, Inc. v. AdOutlet. com, Inc.*, 2001 WL 315219, at *9 (N.D. Ill. Mar. 29, 2001), the court held,

> In this case it appears that the source code created by iXL falls within the definition of 'work made for hire' under 17 U.S.C. § 101. The source code was 'specially ordered or commissioned for use,' and qualifies as a 'contribution to a collective work': the source code written for each section of [the website] constitutes a separate, independent work and is a contribution to the collective whole—that is, the website.

Here, Palatkevich created and combined a number of different computer programs to create Stanacard's new software system. This new system was comprised of various elements including an open source framework, compression software, a multi-protocol library written by Palatkevich's associate Alexander Volkov, a "referral" program, anti-fraud software, routing algorithms, and code for an entirely new Stanacard website. Kohen Aff. Ex. 1 ¶¶ 9-10. The system as a whole is properly deemed a compilation of computer programs. Alternatively, the source code for each program can be deemed a contribution to the "collective work" that is Stanacard's system. Thus, Palatkevich's work falls into one of the nine categories enumerated in § 101(2).

The final question is whether the parties "expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." Here, the NDA does just that. The clause in the NDA governing the transfer of property rights is explicitly titled "Inventions and Work-for-Hire," leaving little doubt that the parties intended the works described therein to be considered works for hire. As was the case in *Playboy Enterprises, Inc. v. Dumas*, 53 F.3d 549, 560 (2d Cir. 1995), the fact that the parties explicitly deemed services to be "works for hire" means the NDA meets the "writing" requirement of §101 of the Copyright Act – assuming, of

15

course, that the agreement was signed by both parties (it was) and the party claiming ownership (Stanacard) can show that the parties had an understanding, *before the creation of the work*, that the programs were to be created as works for hire.

In this case, the NDA tells us very little about what the parties understood before the creation of the work began – way back in 2006 – because the contract was not signed until 2009. For purposes of the "work for hire" doctrine under the Copyright Act (which is not a common law contract doctrine, but a creature of statute), the relevant issue is what both parties (not just Stanacard) understood (whether they wrote it down or not) *prior to the creation of the work.* In this case, much, probably most, of Palatkevich's work was created before the NDA was signed, and all along he was taking Stanacard's money. Furthermore, he signed the NDA giving Stanacard the copyright and he did so without protest, as far as the record reveals. That is certainly some evidence of what the parties understood all along. But the NDA itself is not dispositive of the point.

Because neither party seems to have grasped that the parties' intention at the outset of their relationship is the issue on which the whole "work for hire" argument turns – they briefed the wrong issue altogether (and not for the first time) – no one has come to grips with what the undisputed evidence demonstrates on this critically important point. Palatkevich testifies that he never intended to give Stanacard ownership of what he was creating – although that makes little sense for Stanacard to pay someone the astronomical sum of $30,000 per month to write code, for use in Stanacard's business, only to leave ownership of that code in the hands of its contractor. His testimony creates a genuine issue of fact, one that would have to be tried if "work for hire" were the only card Stanacard had to play on the issue of copyright ownership.

Fortunately for Stanacard, it is not.

16

## C. Assignment of Copyright Under 17 U.S.C. § 204

Under § 204 of the Copyright Act, parties can agree to transfer a copyright pursuant to a written instrument. The NDA does exactly that; the "Inventions and Work-For-Hire Clause" purports to transfer ownership of anything Palatkevich created during his tenure with Stanacard to Stanacard. Thus, even if Palatkevich's work product were not properly considered a work for hire – an issue that cannot be resolved without a trial – the Inventions and Work-For-Hire Clause operated to transfer any property interest Palatkevich might have had in the programs he had already created to Stanacard. This means not only that Palatkevich's motion for summary judgment dismissing the infringement claim must be denied, but also because the undisputed facts show that Stanacard owned the copyrights by assignment, Stanacard is entitled to deem this fact proved at trial.[4]

In order to escape the inescapable, Palatkevich mounts a number of challenges to the validity of the NDA. None of them works.

For example, Palatkevich claims that, even though he read and understood the "work for hire" language in the NDA, he did not "intend" to transfer ownership of his copyright to Stanacard. Palatkevich Br. at 23. But as a matter of simple contract law, that argument avails him nothing. The NDA is a contract, and its language is quite unambiguous; it gives Stanacard ownership over "any and all inventions, discoveries, innovations, improvements, trade secrets, designs, drawings, business processes, strategies and secret processes, whether or not patentable, which may be created, conceived, developed or made, and related or in any way connected with

---

[4] If Palatkevich created any new code after signing the NDA, it would qualify as work-for-hire, because the contract is conclusive on the point and any argument about his secret intentions and understandings (discussed above in text) have absolutely no merit. However, as the assignment operates to transfer ownership in all of the code, whenever created, to Stanacard, the issue of work for hire can and does simply drop out of the case.

[Stanacard]." One of the cardinal rules of contract construction is that the undisclosed "intentions" of a party to a contract cannot serve to vary the plain and unambiguous language of the agreement. *See e.g., Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 467-68 (2d Cir. 2010). That rule bars Palatkevich from asserting that the agreement means something other than what it so plainly says.

Palatkevich argues that this Court should hold that the NDA does not create a valid transfer of property rights because it "lacks specification" – which I assume means that it is insufficiently specific. Again, his argument has no merit.

Section 204 of the Copyright Act invalidates purported transfers of copyright unless "an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a). "Although a writing sufficient to satisfy Section 204 does not have to be long or elaborate, it must explicitly convey a party's intention to sign away his or her copyright interests. Put otherwise, although a one-line pro forma statement will do ... the terms of any writing purporting to transfer copyright interests ... must be clear." *Tjeknavorian v. Mardirossian*, 56 F. Supp. 3d 561, 565 (S.D.N.Y. 2014) (internal quotation marks and citation omitted).

Palatkevich argues that "The scenario as it transpired here precisely is the brand of over-reaching conduct in a transfer of copyright or likewise other intellectual property rights that the Court was describing in Tjeknavorian." Palatkevich Br. at 23. That is utter nonsense. In *Tjeknavorian*, the court held that the parties had not satisfied Section 204's writing requirement *because they had not entered into any written agreement that assigned the copyright*! Rather, the defendant urged the court to infer an intent to transfer a copyright from the parties' course of

18

dealing, as evidenced by emails they had exchanged. This is precisely what Section 204 forbids, and the court held that there was no transfer of copyright.

Here, the situation is entirely different. The parties entered into an explicit written agreement that transferred ownership rights in anything Palatkevich produced for Stanacard to Stanacard. The NDA states clearly that "prior to and during the Relationship, any and all inventions … shall be the sole and exclusive property of Company as against Individual." In case there is any confusion as to whether that transfer includes the transfer of intellectual property, including copyright, the Inventions and Work-For-Hire clause goes on to clarify that Palatkevich "further agrees to execute and acknowledge all papers and to do, at Company's expense, any and all other things necessary for or incident to the applying for, obtaining, and maintaining of such letters patent, *copyrights*, trademarks or other intellectual property rights, as the case may be, and to execute, on request, all papers necessary to assign and transfer such inventions, improvements, designs, discoveries, writings, *copyrights*, patents, patent applications and other intellectual property rights to Company, its successors and assigns." (emphasis added).

In other words, the NDA transfers ownership – and all ownership's attendant rights – of the software Palatkevich created to Stanacard. Ownership of the software includes ownership of its copyright. Indeed, the NDA specifically compels Palatkevich to give effect to that ownership by aiding the company in its registration of the copyright, should it be necessary. There can be no question that the NDA clearly and explicitly transfers the copyright at issue, as Section 204 requires.

Finally, Palatkevich also argues that the NDA is unenforceable because he received no consideration in exchange for entering into it. But that is nonsense. Palatkevich was paid $30,000 per month for more than three years while he created the programs that he assigned to Stanacard via the NDA. And while the contract was not signed until close to the end of his association with Stanacard (although its Effective Date was, by agreement of the parties, some

19

two years earlier), the undisputed evidence shows that he continued to be paid, and to accept payment, at the same rate for some six months after the NDA was signed.

Were he an employee, under New York law, continued employment would be deemed consideration for purposes of entering into a restrictive covenant with one's employer, as long as employment continued for a "substantial period" following the execution of the agreement. *See Int'l Paper Co. v. Suwyn*, 951 F. Supp. 445, 448 (S.D.N.Y. 1997). Reasoning by analogy (since Palatkevich was not "employed" by Stanacard, but was an independent contractor), Palatkevich, argues that his services were not continued for a sufficiently "substantial" period following the execution of the agreement. For two reasons, I disagree.

First, the decision to end Palatkevich's affiliation with Stanacard was his, not Choupak's. Palatkevich voluntarily terminated the contract between him and Stanacard; he elected not to continue. This estops him from arguing that the term of his continued affiliation with the company (which was not, in fact, "employment") was too short.

Palatkevich and Stanacard had a contract, the terms of which were that Stanacard would pay Palatkevich $30,000 each month to do programming.[5] Palatkevich has never asserted that Choupak breached the agreement between him and Stanacard by unilaterally announcing that his salary would have to be cut, and for good reason: there is not the slightest evidence that the parties made their contract for any particular terms of years (or even months). That being so, it was a month to month arrangement, one that either party was free to end at any time (as Choupak

---

[5] The $30,000 was to compensate Palatkevich, not just for his own services, but for the use of his office and the services of his confederate, Alexander Volkov. Krol Decl. Ex. J. Choupak justified a lesser compensation for Palatkevich, not only because Stanacard was having financial difficulties, but also because Volkov was no longer working on the project and Stanacard had leased its own offices. *Id.* So the supposedly dramatic cut in compensation may not have been quite as dramatic after all.

did by announcing that the terms of the deal would have to be revised) and that was always subject to renegotiation. Palatkevich, confronted with Choupak's desire to alter the terms of their prior dealings – terms to which he was not bound beyond the beginning of each new month – chose not to renegotiate. He was free to make that decision. But the decision was, in the end, his – as is evidenced by the fact that, following his resignation, another Stanacard officer, Anastasia Koroleva, tried to reach acceptable new terms with Palatkevich, so that he would continue his work for Stanacard. Kohen Decl. Ex. 1 at 22. Those discussions came to nought, but they undermine any suggestion that Stanacard tried to get Palatkevich to quit by making his working conditions intolerable.

Of course, Palatkevich insists that he had no choice but to end the contract, since Choupak notified him that his monthly compensation would have to be reduced from $30,000 to $12,500. This, he says, rendered his "employment" intolerable, bringing him within the "constructive discharge" doctrine. Palatkevich Br. at 25.

Plaintiff argues – and it stands to reason – that Palatkevich cannot have it both ways; if he was not a Stanacard employee (in which case anything and everything he did during his employment would belong to Stanacard), then he cannot cloak himself in employment law doctrines, like "constructive discharge." Pl. Opp. to Palatkevich at 8. However, while the language of constructive discharge is that of employer and an employee, Plaintiff does not cite – and this Court cannot find – any case that prohibits application of this doctrine.

But assuming Palatkevich *could* rely on the constructive discharge – or reasoning by analogy from employment cases – the doctrine does him no good. The six months that passed between the time Palatkevich signed the NDA and the time he elected to end his relationship with Stanacard was a "substantial period" of employment.

21

Admittedly, New York courts have not established a lower boundary for what time period constitutes a "substantial period" of employment. Courts have held under New York law that five and a half years, *Zellner v. Stephen D. Conrad, M.D., P.C.*, 183 A.D.2d 250, 252, 589 N.Y.S.2d 903, 905 (1992), and slightly over two years, *Ikon Office Sols., Inc. v. Leichtnam*, No. 02-CV-0721E(SC), 2003 WL 251954, at *2 (W.D.N.Y. Jan. 3, 2003), were "substantial periods" of employment. But that appears self-evident. A New Jersey state court, citing *Zellner*, held that 4 months, however, is insufficient. *Grinspec, Inc. v. Lance*, 2002 WL 32442790, at *7 (N.J. Super. Ct. App. Div. Aug. 13, 2002).

Judge Parker, my erstwhile colleague in this court, held in *International Paper* that six months – the same time period at issue here – constitutes a "substantial period" of employment. Palatkevich states that the period of employment at issue in *International Paper* was 18 months, but he is wrong. The *restrictive covenant* in the non-competition agreement was in place for a period of 18 months, but a brief review of the docket reveals that Suwyn signed the non-compete in July 1995 and resigned in January 1996 – a period of employment of 6 months following the execution of the agreement. *See Int'l Paper Co. v. Suwyn,* No. 7:96-cv-00143, Docket Entry No. 80.

I agree with Judge Parker. Six months of additional work – particularly at the rate of $30,000 per month – is without question sufficient additional "employment" (I put the word in quotes because the parties agree that Palatkevich was not an employee) to qualify as "substantial" for purposes of the consideration doctrine. Thus, Palatkevich has not raised a genuine issue of fact on the "substantial period" point and the assignment under § 204 is valid and enforceable.

For these reasons, Palatkevich's motion for summary judgment dismissing Count 2 is denied. Because the undisputed evidence shows that Stanacard, not Palatkevich, owns the copyright in the relevant code, Stanacard prevails on this point and it will be deemed established at trial.

## III.    Statutory Damages and Attorneys' Fees Are Barred as Matter of Law

Defendants ask for a ruling that, because Stanacard did not register its copyright in the software written by Palatkevich until after any infringement by Rubard had commenced, it cannot seek statutory damages, enhanced damages, or attorneys' fees. Defendants are correct.

The Copyright Act provides that a copyright infringer may be liable for either actual damages and additional profits, or statutory damages. 17 U.S.C. § 504(a). However, the Act also precludes a plaintiff from seeking statutory damages or attorneys' fees for infringement that "commenced before the effective date of . . . registration." 17 U.S.C. § 412; *Granger v. Gill Abstract Corp.*, 566 F. Supp. 2d 323, 333-34 (S.D.N.Y. 2008).

Stanacard alleges that Rubard infringed its copyright by reproducing software allegedly copyrighted by Stanacard and using that software to offer services similar to those offered by Stanacard. It is undisputed that Stanacard filed an application for registration of its copyright on July 2, 2012. *See* Compl. ¶ 13. The effective date of registration of that copyright is July 13, 2012. *See* Harrison Decl. Ex. 4. Rubard began offering its services to the public in April 2011. That is the latest possible date upon which Rubard can be deemed to have commenced its alleged infringement (indeed, Stanacard argues that Rubard was actually operating *prior* to April 2011). Thus, there is no question that Rubard commenced its alleged infringement prior to the date of Stanacard's copyright registration.

Stanacard argues that Palatkevich continued to revise the CentMobile website and software during the course of CentMobile's operations and that "Each modification of Rubard's

23

software may constitute an additional act of infringement ... for which Stanacard may be entitled to recover statutory damages and attorneys' fees." Stanacard's Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Pl. Opp. to Rubard") at 18.

Case law in this circuit forecloses such an argument. "[A] plaintiff may not recover statutory damages and attorney's fees for infringement occurring after registration if that infringement is part of an ongoing series of infringing acts and the first act occurred before registration." *Troll Co. v. Uneeda Doll Co.*, 483 F.3d 150, 158 (2d Cir. 2007). *See also Secunda v. Time Warner Cable of New York City,* No. 95 CIV. 0671(SAS), 1995 WL 675464, at *2 (S.D.N.Y. Nov. 14, 1995). Here, assuming CentMobile's software infringes Stanacard's copyright, any further revisions to CentMobile's website after the July 2012 copyright registration are part of "an ongoing series of infringing acts" whose "first act" occurred in April 2011, long before registration.

Plaintiff is therefore barred from seeking statutory damages and attorneys' fees in connection with its copyright infringement claim; it is limited to what it can prove in actual damages to Stanacard.

## IV. The Rubard Defendants' Motion for Summary Judgment Dismissing Count 2 as Asserted Against Dzerneyko and Zaytsev is Granted as Against Dzerneyko but Denied as Against Zaytsev

The Rubard Defendants argue that the Complaint must be dismissed in its entirety against Dzerneyko because Dzerneyko was simply an investor in Rubard, and had no responsibility for the management of the company. They similarly argue that Zaytsev cannot be liable for copyright infringement because the undisputed evidence demonstrates that he was responsible solely for the financial side of Rubard, not the technological side, where the alleged infringement occurred.

24

Clearly, neither Dzerneyko nor Zaytsev can be liable for direct copyright infringement. To establish direct copyright infringement, a plaintiff must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Artista Records, LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010) (citation omitted). The Copyright Act imposes direct liability only on specific individuals (or entities) who copy, reproduce or distribute copyrighted material in violation of the exclusive rights of the copyright holder. 15 U.S.C. § 106 & 501(a); *Cartoon Network LP, LLLP v. CSC Hldis.*, Inc., 536 F.3d 121, 130-31 (2d Cir. 2008).

Neither Dzerneyko nor Zaytsev had anything to do with writing the software that allegedly infringed Stanacard's copyright. Palatkevich wrote and was entirely responsible for the allegedly infringing software; he did not even transfer that software from his personal laptop to Rubard's system until it was complete. Rubard 56.1 ¶¶ 50-55. There is no evidence in the record indicating otherwise.

The question, then, is whether Dzerneyko or Zaytsev could be secondarily liable – via contributory infringement or vicarious liability – for the alleged copyright infringement. On the record before me, the answer is no.

The fact that an individual is president and shareholder of a company is insufficient on its own to create secondary liability for a corporation's copyright infringement. *Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 971 (2d Cir. 1997). Rather, the record must establish a more direct link between the individual and the act of infringement.

To hold an individual liable for contributory infringement he must have knowledge of the underlying direct infringement and "engage in personal conduct that encourages or assists the infringement." *Agence Fr. Presse v. Morel*, 934 F. Supp. 2d 547, 572 (S.D.N.Y. 2013). "A

25

party without actual knowledge of the particular instances of infringement may still be found liable as a contributory infringer; constructive knowledge is sufficient to establish liability." *Ez-Tixz, Inc. v. Hit-Tix, Inc.*, 919 F. Supp. 728, 732 (S.D.N.Y. 1996). The participation or contribution must be substantial. *Arista Records LLC v. USENET.com*, 633 F. Supp. 2d 124, 155 (S.D.N.Y. 2009).

To establish vicarious liability, a plaintiff must show that the defendant has "(1) the right and ability to control or supervise the infringing activity and (2) a direct financial interest in the exploitation of the copyrighted materials." *Agence Fr. Presse*, 934 F. Supp. 2d at 574. In contrast to contributory infringement, vicarious liability for copyright infringement "does not include an element of knowledge or intent on the part of the vicarious infringer." *Arista Records LLC v. Usenet.com, Inc.*, 633 F.Supp.2d 124, 156 (S.D.N.Y.2009).

### A.    Dzerneyko

In their 56.1 statement, the Rubard Defendants state that Dzerneyko is not employed by Rubard and does not have – nor has he ever had – any management responsibility for running Rubard. He is simply a passive investor. Rubard 56.1 ¶¶ 44-48. As Stanacard failed to contest these facts with any citation to the record, they are deemed admitted. Moreover, the record contains no evidence that Dzerneyko has or had any role or involvement in the operations of Rubard such that he could be deemed to "encourage or assist" Rubard's alleged infringement, let alone in any substantial way, as required for a finding of contributory infringement. Nor is there any evidence to suggest Dzerneyko had "the right and ability to control or supervise the infringing activity" as required for a finding of vicarious liability. There is no evidence that Dzerneyko so much as *corresponded* with Palatkevich about the software that comprised Rubard's system.

Rubard's corporate structure confirms Dzerneyko's limited role. The Rubard LLC Agreement lists Dzerneyko as a "Member" who made a $250,000 capital contribution. Only Zaytsev is a "Manager" of Rubard – the individual "responsible for the operation and management of the business and affairs of the Company...." Krol Ex. F at 4.2.

Stanacard asserts that "this record is replete with examples of Dzerneyko's complete domination and control over Rubard's activities." Pl. Opp. to Rubard at 16. That is a gross mischaracterization of the evidence. The exhibits Stanacard cites support the notion that Dzerneyko's interactions with Rubard related to his position as majority shareholder.

For example, Dzerneyko stated at his deposition that he advised on how Rubard, in its first year, should use its capital with respect to marketing campaigns, approved the more expensive contracts with suppliers, and agreed with Zaytsev on the "general terms" of Palatkevich's compensation (which he could not recall, noting that Zaytsev was responsible for the details). *See* Krol Ex. D. That does not render Dzerneyko in "complete domination and control" of Rubard, as Stanacard suggests. It merely suggests that, as majority investor, Dzerneyko was kept in the loop on how his capital was being used, perhaps in an effort to prevent him from withdrawing it, as he threatened to do at various times. *See* Krol Decl. Ex. L.

More importantly, this evidence does not suggest that Dzerneyko *encouraged or assisted the alleged infringement*, as required for contributory liability, or that he had the right to *supervise or control the infringement*, as required for vicarious liability. In fact, that Dzerneyko's influence on Rubard was solely about financial matters confirms that he was nothing more than a majority owner who had a lot of money invested in the company, which gives him good reason to be interested in its business but does not make him liable for vicarious copyright infringement. Other courts have held the same. For example, in *Banff Ltd. v. Ltd.,*

27

*Inc.*, 869 F. Supp. 1103, 1110 (S.D.N.Y. 1994), the court held that obligations to provide financial reports to a corporate parent, while day to day decisions regarding the operations of the wholly owned subsidiary were in the hands of the subsidiary's employees, did not confer the "right and ability to supervise" on the parent.

Rubard cites to one email in which Dzerneyko wrote the following to CentMobile Customer Support, in response to a customer complaint: "new destination for us, Gambia. i [sic] switched from 3U to xconnect, let's see if it helps." Krol Ex. M at RUBARD0013315. While I have absolutely no idea what it means to switch from "3U to xconnect," I will credit Stanacard's suggestion that this email suggests that Dzerneyko was giving operational advice. But a single instance (one that does not appear to relate to the infringing act) does not suggest that Dzerneyko was involved in the company's day to day operations or create a genuine issue of material fact as to whether Dzerneyko had the right and ability to control or supervise the creation of CentMobile's software.

Because there is no evidence of conduct on the part of Dzerneyko personally that would support liability for infringement, the copyright claim against him is dismissed.

### B. Zaytsev

The question of Zaytsev's secondary liability is not as straightforward. On the one hand, Zaytsev was responsible for the day to day operations of Rubard, per the Rubard LLC Agreement. On the other, Palatkevich was solely responsible for creating and maintaining the software at issue. Zaytsev's responsibilities at Rubard were financial, not technical, Rubard 56.1 ¶ 42 (deemed admitted), and nothing in the record suggests otherwise.

Contributory infringement requires knowledge and "personal conduct that encourages or assists the infringement." A reasonable juror could conclude circumstantially that Zaytsev knew – or at least had constructive knowledge – of the alleged infringement, simply based on the

28

parties' shared history. That Zaytsev and Palatkevich, upon the termination of their respective arrangements with Stanacard, quickly embarked on a venture offering a competing product that relied at least on similar technology could lead a reasonable juror to conclude that, if Rubard's software infringes Stanacard's copyright, Zaytsev must have known it.

As for whether Zaytsev engaged in conduct that "encouraged or assisted" the infringement, Stanacard points out that by January 2011 (the precise timing is unclear from the record), Palatkevich was living in an apartment paid for by Zaytsev and drove a car for which Zaytsev paid. Pl. Opp. to Rubard at 6; Krol Decl. Ex. C. Though this is not much to go on, such financial support creates a genuine issue of material fact as to whether Zaytsev assisted Palatkevich in his alleged infringement. I therefore deny summary judgment as to Zaytsev's personal liability for the alleged copyright infringement; Zaytsev will go to trial on the issue of contributory infringement.

As for whether he may be vicariously liable for the alleged infringement, Stanacard must show that Zaytsev had the "right and ability to control or supervise the infringing activity" and had a "direct financial interest in the exploitation of the copyrighted materials." Zaytsev certainly had a direct financial interest in the exploitation of Stanacard's copyright; the alleged infringement serves as the entire basis for the CentMobile/Rubard business model, of which Zaytsev is approximately a 10% owner. However, the evidence establishes without contradiction that Palatkevich was solely responsible for the technological side of the business. The only evidence that Zaytsev had any "right and ability to control" Palatkevich's activities is his role as Manager of Rubard – the individual responsible for its day to day operations. That, by itself, is not enough to hold him vicariously liable. If it were, any chief operating officer – or, for that matter, any officer with the capability to fire employees – could be held responsible for any

employee's copyright infringement. If the record contained evidence that Zaytsev provided any direction whatsoever to Palatkevich regarding software content, the result might be different. But no such evidence exists.

Because there is a genuine issue of material fact as to Zaytsev's alleged contributory infringement, summary judgment dismissing the copyright claim as asserted against Zaytsev is denied.

## V.     The Rubard Defendants' Motion for Summary Judgment Dismissing the Remaining Claims Against Dzerneyko is Granted

It is a basic principle of law that the owners of an LLC, like the shareholders of a corporation, are not liable for the acts of the LLC unless there are grounds for piercing the corporate veil. *See Bigio v. Coca-Cola Co.*, 675 F.3d 163, 170-71 (2d Cir. 2012). Here, there is no basis for Stanacard to seek to pierce Rubard's corporate veil and hold Dzerneyko liable for any of the claims alleged against Rubard.

Because Rubard is a Delaware limited liability company, Compl. ¶ 7, Delaware law determines whether the corporate veil can be pierced. *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995). Delaware law permits a court to pierce the corporate veil only "where there is fraud or where the [company] is in fact a mere instrumentality or alter ego of its owner." *NetJets Aviation, Inc. v. LHC Communs., LLC*, 537 F.3d 168, 176 (2d Cir. 2008).

Here, there is absolutely no basis in the record to infer that Rubard was a "mere instrumentality" or "alter ego" of Dzerneyko; nor does Plaintiff suggest such a basis exists. As discussed above, Plaintiff offers no evidence that Dzerneyko even played a significant management role in Rubard, let alone that the company was his "alter ego."

The Rubard Defendants' motion for summary judgment dismissing the remaining claims as alleged against Dzerneyko is granted.

30

## VI. Summary Judgment Dismissing Count 3 is Denied and Summary Judgment Dismissing Count 8 is Granted

Stanacard brings two claims for misappropriation of trade secrets against all Defendants: one count in violation of New York common law (Count 3) and one count in violation of the Delaware Uniform Trade Secrets Act ("DUTSA") (Count 8). These two claims are duplicative, since the exact same facts are alleged to violate both New York and Delaware law.

### A. Misappropriation of Trade Secrets in Violation of DUTSA

Defendants argue that New York law governs any alleged misappropriation of trade secrets, so Count 8 – applying Delaware law to the alleged conduct – must be dismissed. They argue that choice of law rules compel application of New York law to the misappropriation theory, and that summary judgment dismissing the DUTSA count must therefore be granted. Defendants are ultimately correct, but they omit a number of steps relevant to their analysis.

The first question is whether Plaintiff can bring two claims for misappropriation on the same facts – one for violation of DUTSA and one for misappropriation of trade secrets under New York common law. The answer is no.

Delaware adopted the Uniform Trade Secrets Act with the express purpose to "make uniform the law with respect to trade secrets." *Ethypharm S.A. France v. Bentley Pharm., Inc.*, 388 F. Supp. 2d 426, 433 (D. Del. 2005). Section 2007 of DUTSA provides that the Act, with exceptions not relevant here, "displaces conflicting tort, restitutionary and other law of this State providing civil remedies for misappropriation of a trade secret." Del. Code Ann. tit. 6, § 2007. "Accordingly, the DUTSA preserves a single tort cause of action under state law for misappropriation of trade secrets and eliminate[s] other tort causes of action founded on allegations of trade secret misappropriation." *Overdrive, Inc. v. Baker & Taylor, Inc.*, No. CIV.A. 5835-CC, 2011 WL 2448209, at *4 (Del. Ch. June 17, 2011) (internal quotation marks

and citation omitted) (emphasis in original omitted). It would be entirely contrary to DUTSA's purpose to permit a plaintiff to bring a claim for misappropriation under the common law – whether of New York or of Delaware – while simultaneously bringing a statutory claim. Indeed, DUTSA expressly precludes such an approach.

One court in this Circuit has addressed this very question. In *Bulldog New York LLC v. Pepsico, Inc.*, 8 F. Supp. 3d 152 (D. Conn. 2014), the plaintiff brought two claims for misappropriation of trade secrets, one count under New York's common law and one count under Connecticut's Uniform Trade Secrets Act ("CUTSA"). CUTSA contains a provision preempting state law misappropriation claims that is substantively identical to DUTSA's. The court held that both counts could not be brought because, "If New York law applies, the CUTSA claim in Count 2 cannot be brought; if Connecticut law applies, a common law claim for misappropriation of trade secrets is preempted by CUTSA." *Id.* at 162. So too, here.

Since Plaintiff cannot bring both Count 3 and Count 8, we are left with one count of misappropriation of trade secrets. The next question is what law applies to that claim.

I must first determine whether there is a conflict between the law of Delaware and the law of New York. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,* 672 F.3d 155, 157 (2d Cir. 2012). Because Delaware has adopted the Uniform Trade Secrets Act and New York has not, there is such a conflict.

This conflict is apparent in the very definition of a trade secret under the two state's laws. Under DUTSA, a trade secret is:

> information, including a formula, pattern, compilation, program, device, method, technique or process, that:
>
>> a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means

32

by, other persons who can obtain economic value from its disclosure or use; and

b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy

Del. Code Ann. tit. 6, § 2001. By contrast, the existence of a trade secret under New York law is determined by consideration of six different factors, which include not only the economic value of the information and degree of secrecy, but also "the amount of effort or money expended by [the business] in developing the information." *Ashland Management Inc. v. Janien*, 82 N.Y.2d 395, 407 (1993).

Delaware and New York also differ in that the effort to maintain secrecy is not a prerequisite to the existence of a trade secret under New York law, it is merely a factor to be considered. Under DUTSA, it is a prerequisite.

Other courts in this Circuit to consider differences between the New York common law and the Uniform Trade Secrets Act have found a conflict as well. *See e.g., Bulldog New York*, 8 F. Supp. 3d at 162 (Connecticut Uniform Trade Secrets Act); *Innovative BioDefense, Inc. v. VSP Techs.*, Inc., No. 12 CIV. 3710 ER, 2013 WL 3389008, at *2 (S.D.N.Y. July 3, 2013) (California Uniform Trade Secrets Act); *Sarkissian Mason, Inc. v. Enter. Holdings, Inc.*, 955 F. Supp. 2d 247, 253-54 (S.D.N.Y. 2013) (Missouri Uniform Trade Secrets Act).

Having determined that Plaintiff cannot bring misappropriation claims under both DUTSA and New York common law and that a conflict between the two regimes exists, it is necessary to decide whether Delaware or New York law governs the misappropriation claim.

To choose the applicable state law, the forum state's choice of law rules govern. *Softel*, 118 F.3d at 967. Under New York's choice of law rules, the law of the jurisdiction having the greater interest in the litigation controls. *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 137 (2d Cir. 1991).

Rubard and Stanacard are both organized under Delaware law. That is the only connection Delaware has to this case. All other factors point to New York as the jurisdiction with the greater interest. None of the individual defendants resides or does business in Delaware; Zaytsev and Palatkevich reside in New York, while Dzerneyko lives in Connecticut. Compl. ¶¶ 5-6, 8. Both Stanacard and Rubard have their primary offices in New York. Compl. ¶¶ 4, 7. Thus, if any alleged misappropriation took place, it occurred in New York. Stanacard does not allege otherwise.

*Softel* is particularly instructive on this point. In that case, though both parties were out-of-state corporations, the Second Circuit held that New York law applied to a misappropriation of trade secrets claim because: "(1) the defendant maintains offices in New York; (2) the plaintiff apparently maintains an apartment and de facto office in New York; and (3) the misappropriation, if any, apparently took place in New York, at [plaintiff's] offices." *Softel,* 118 F.3d at 968. So too, here.

Thus, New York law governs the misappropriation of trade secrets claim. The Rubard Defendants' motion for summary judgment dismissing Count 8, which Palatkevich joins, is granted.

**B.    Misappropriation of Trade Secrets Under New York Law**

In its brief in opposition to the Rubard Defendants' motion, Stanacard provided a list of the purported trade secrets that were misappropriated. *See* Pl. Opp. to Rubard at 20; Bernstein Decl. ¶¶ 3-18. In response, Defendants argue that the purported "trade secrets" are not trade secrets at all. They also argue that there is no evidence of any such misappropriation.

"To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of

34

discovery by improper means." *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43-44 (2d Cir. 1999).

Under New York law, a trade secret is defined as "any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it." *Ashland Management*, 82 N.Y.2d at 407. New York follows the Restatement of Torts in determining whether information is in fact a trade secret. *See id*. The Restatement sets forward the following factors for consideration:

> (1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* (citing Restatement of Torts § 757, comment b). The existence, *vel non*, of a trade secret usually is treated as a question of fact. *Chevron U.S.A., Inc. v. Roxen Serv., Inc.*, 813 F.2d 26, 29 (2d Cir. 1987).

Stanacard claims the following as trade secrets: Stanacard's customer list, the identity of its vendors, the implementation of its marketing/referral program, Stanacard's "management console" – which tracks customer information such as name, address, amount on deposit, calls made, registered numbers, and other more technical information about a customer's use of the service, *see* Krol Decl. Ex. P – and the rates Stanacard charges its customers. *See* Pl. Opp. to Rubard at 20; Bernstein Decl. ¶ 6. There are sufficient questions of material fact to deny summary judgment on all proposed trade secrets but one: the rates that Stanacard charges its customers.

35

The rates that Stanacard charges its customers are, quite obviously, not secret. They are published on Stanacard's website. By definition, such information cannot be a trade secret. *See Jay's Custom Stringing v. Yu*, No. 01 Civ. 1690 (WHP), 2001 WL 761067, *6 (S.D.N.Y. July 5, 2001) (information discoverable from a plaintiff's website cannot be a trade secret).

As for the remaining categories, however, Stanacard has offered at least some evidence to support its claim that the information was not readily ascertainable to the public, and that it took steps to keep this information confidential. According to Bernstein, Stanacard protected all of its purported trade secrets via passwords, as well as a "two-step verification," which Stanacard has not explained further, but is presumably a more rigorous identity verification process that restricts user access. The NDAs that Palatkevich and Zaytsev signed were also drafted to protect Stanacard's confidential information. These safeguards alone create a genuine issue of material fact as to whether Stanacard's customer list, referral process, vendors, and management console were trade secrets.

There is also a genuine issue of material fact as to whether Stanacard misappropriated the alleged trade secrets. Plaintiff argues that the overlap in the lists of the two companies' vendors and customers, *see* Krol Aff. Ex. N, and the similar nature of the two companies' management consoles, *see* Krol Aff. Ex. P, and referral programs, combined with Zaytsev's and Palatkevich's access to Stanacard's proprietary information create a genuine issue of material fact as to whether Defendants "used" the alleged trade secrets. Pl. Opp. to Rubard at 20. Admittedly, the record contains no direct evidence of misappropriation. But "misappropriation and misuse can rarely be proved by convincing direct evidence." *Q-Co Indus., Inc. v. Hoffman*, 625 F. Supp. 608, 618 (S.D.N.Y. 1985). As a result, "In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which

convince him that [misappropriation] is more probable than not." *Id.* Stanacard has done so here.

The Rubard Defendants present a fairly convincing rebuttal to any inference of misappropriation, arguing, for example, that similarities in the management consoles are to be expected, given that the parties engage in the same business, and that the overlap of customers is limited to mutual acquaintances of the parties. But those are facts for a jury to consider; they do not nullify the genuine issue of material fact that Stanacard has identified.

Finally, the NDAs – which include a "confidentiality" clause prohibiting the use of any proprietary company information – create a genuine issue of material fact as to whether the use of the alleged trade secrets was "in breach of an agreement, confidential relationship or duty."

The Rubard Defendants' motion for summary judgment dismissing Count 3, joined by Palatkevich, is denied.

## VII.    The Rubard Defendants' Motion for Summary Judgment is Granted as to Count 9 and Denied as to Count 10

In Count 9, Plaintiff alleges that Defendants converted Stanacard's systems – defined in the Complaint as Stanacard's "unique and proprietary operating and anti-fraud computer systems," ¶ 12 – its copyrighted software, and its alleged trade secrets. Compl. ¶ 74-77. In Count 10, they similarly allege that Defendants were unjustly enriched by using those works. Compl. ¶ 78-80. The Rubard Defendants argue that "Stanacard's state law claims … are based on the allegedly wrongful use or copying of Stanacard's software program, and therefor[e] are preempted." Rubard Br. at 10. To the extent that the conversion and unjust enrichment claims are based on the use of Stanacard's software – also the subject of the copyright infringement claim – the Rubard Defendants are correct.

37

The Copyright Act expressly preempts all claims based on state law rights that are equivalent to the rights protected by copyright law. 17 U.S.C. § 301(a). The Second Circuit has held that the Copyright Act preempts a state law claim when: "(1) the particular work to which the claim is being applied falls within the type of works protected by the Copyright Act under 17 U.S.C. §§ 102 and 103, and (2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by copyright law under 17 U.S.C. § 106." *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305 (2d Cir. 2004). The first prong of this test is known as the "subject matter requirement," the second is known as the "general scope requirement." *Id.* Under the "general scope requirement," a state law claim is not preempted if it requires proof of an "extra element" that makes it "qualitatively different from a copyright infringement claim." *Id.*

Here, the subject matter requirement is clearly met. A software program plainly falls within the type of works protected by copyright. *See BroadVision Inc. v. Gen. Elec. Co.*, No. 08 CIV.1478(WHP), 2008 WL 4684114, at *3 (S.D.N.Y. Oct. 15, 2008). Indeed, having registered a copyright in the software at issue, Plaintiff could hardly argue otherwise.

As discussed below, the general scope requirement is met with regard to both the conversion and unjust enrichment claims, and therefore both claims are preempted to the extent that they are based on Defendants' use of Plaintiff's software. The rest of Plaintiff's conversion claim is also dismissed, because there is no evidence in the record that Defendants' interfered with Stanacard's use of its systems, software, or trade secrets. However, because the unjust enrichment claim is not predicated solely on material preempted by the Copyright Act, summary judgment is denied as to Count 10.

## A.  Conversion

The Second Circuit has explained that a conversion claim that is based on the use, reproduction or publication of material is preempted by the Copyright Act. Only a conversion claim based upon the wrongful possession of physical property – and exclusion of the rightful possessor – contains the "extra element" that would make it qualitatively different from a copyright claim. *Harper & Row, Publs. v. Nation Enters.*, 723 F.2d 195, 200-01 (2d Cir. 1983), *rev'd on other grounds*, 471 U.S. 539 (1985).

Stanacard attempts to establish the required "extra element" by arguing that Palatkevich actually kept a physical copy of Stanacard's software on his hard drive, but that does not save its claim. Stanacard acknowledges that Palatkevich, who had previously maintained Stanacard's software on his own servers, provided Stanacard with the current version of software upon his departure. Pl. Opp. to Rubard at 21. Palatkevich's alleged retention of a copy of the Stanacard software did not, therefore, interfere with Stanacard's possessory interest in it. As such, the conversion claim merely alleges that Defendants impermissibly used a reproduction of Stanacard's software – a claim that is not qualitatively different from a copyright claim. The conversion claim is therefore partially preempted.

For the same reason, Count 9 must be dismissed in its entirety. The conversion claim is based, not only on Stanacard's software, but also on Defendants' alleged use of Stanacard's purported trade secrets and systems.[6]  Plaintiff does not argue, nor is there any evidence in the record to suggest, that Defendants' alleged use of the trade secrets or systems interfered, in any

---

[6] In its opposition brief, Plaintiff claims that Zaytsev "must have retained Stanacard's corporate documents in electronic form." Pl. Opp to Rubard at 22. Plaintiff does not specify what corporate documents they believe Zaytsev retained; I assume that these documents are the same as the purported trade secrets Defendants are alleged to have misappropriated.

39

way, with Stanacard's own use of that same information. "Conversion requires not merely temporary interference with property rights, but the exercise of unauthorized dominion and control *to the complete exclusion of the rightful possessor.*" *Harper & Row Publs.*, 723 F.2d at 201 (2d Cir. 1983) (emphasis added). *See also Vigilant Ins. Co. of Am. v. Hous. Auth. of City of El Paso, Tex.*, 87 N.Y.2d 36, 44 (1995). ("Conversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another *to the exclusion of the owner's rights.*") (internal quotation marks and citation omitted) (emphasis added).

Though New York courts have held that the misappropriation of intangible property, such as electronic records stored on a computer, can give rise to a claim for conversion, *Thyroff v. Nationwide Mut. Ins. Co.*, 8 N.Y.3d 283, 292 (2007), an action for conversion of intangible property must still satisfy the requirement of unauthorized dominion and control to the complete exclusion of the rightful possessor. *Hyo Jung v. Chorus Music Studio, Inc.*, No. 13-CV-1494, 2014 WL 4493795, at *8 (S.D.N.Y. Sept. 11, 2014). Here, there is no evidence in the record that Defendants' alleged misappropriation of documents or electronic data interfered with Plaintiff's use of the same.

The Rubard Defendants' motion – also joined by Palatkevich – for summary judgment dismissing Plaintiff's conversion claim (Count 9) is granted.

## B. Unjust Enrichment

To prevail on a claim of unjust enrichment, a party must show that "(1) the other party was enriched, (2) at that party's expense, and (3) that 'it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011).

It is well-settled law in this circuit that an unjust enrichment claim based on copyrighted subject matter is preempted by the Copyright Act, because a claim for unjust enrichment

40

contains no "extra element" that makes it qualitatively different from a copyright infringement claim. *See Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004).

Plaintiff alleges only that Defendants "used, without consideration or justification ... the Systems, the Stanacard Copyrighted Works, and the Stanacard Trade Secrets ... and were unjustly enriched thereby." Compl. ¶ 79. Where the gravamen of an unjust enrichment claim is that defendants "unjustly benefitted from unauthorized use" of a work within the scope of the Copyright Act – precisely what Plaintiff alleges here – the claim is preempted. *Einiger v. Citigroup, Inc.*, No. 1:14-CV-4570-GHW, 2014 WL 4494139, at *6 (S.D.N.Y. Sept. 12, 2014). Thus, Defendants' unjust enrichment claim is preempted, to the extent it is based on the Stanacard software.

That leaves, however, the claim for unjust enrichment based on the alleged use of Stanacard's systems and trade secrets. The parties have not made clear whether the antifraud systems would also be subject to preemption. If the systems are comprised of copyrighted subject matter – that is, if the "antifraud system" is simply additional software that Palatkevich designed while working for Stanacard – then the claim as based on the Stanacard systems is preempted as well.

As for the trade secrets, Defendants' only argument in support of summary judgment is that "the record contains no evidence that the Rubard Defendants misappropriated any Stanacard trade secret." Rubard Reply at 12. This is the same argument the Rubard Defendants made in favor of summary judgment on the misappropriation claim. As discussed above, *supra* at 34-37, there is a genuine issue of material fact as to whether any trade secrets were misappropriated.

Thus, Count 10 is preempted only to the extent that it is based on Defendants' alleged use of Stanacard software. To the extent that it is based on Defendants' alleged use of Stanacard's

trade secrets – a claim with the same factual predicate as the misappropriation of trade secrets claim – the jury will be instructed that Plaintiff is not entitled to double recovery.

## VIII. The Rubard Defendants' Motion for Summary Judgment Dismissing Count 5 (Breach of Contract Against Zaytsev) Is Denied

The Rubard Defendants argue that the breach of contract claim against Zaytsev fails because the NDA – the contract Zaytsev is alleged to have breached – is unsupported by consideration and therefore unenforceable. Specifically, they claim that 10 months – the amount of time Zaytsev worked for Stanacard following the execution of the NDA – is too short to constitute the "substantial period of employment" that could serve as consideration for the NDA. They also argue that, even if the NDA were supported by adequate consideration, Stanacard waived the ability to enforce the post-employment restrictive covenant in the NDA because it terminated Zaytsev without cause. Rubard Br. at 20-24.

Plaintiff responds that (1) there was adequate consideration for the NDA and (2) Zaytsev was fired for cause.

Zaytsev, unlike Palatkevich, was an employee of Stanacard. As mentioned above, *supra* at 20, under New York law, continued employment is deemed consideration for purposes of entering into post-employment restrictive covenants, as long as employment continued for a "substantial period" following the execution of the agreement. *See Int'l Paper Co.*, 951 F. Supp. at 448. Zaytsev argues that the length of his continued employment – 10 months from the date he signed the agreement – is too short to serve as consideration. Zaytsev is wrong. I have found that a period of 6 months' continued employment constitutes a "substantial period" of employment under New York law. *See supra* at 22. So the 10 months that Zaytsev was employed is more than adequate consideration for the NDA.

42

The Rubard Defendants also argue that the NDA's covenant not to compete is unenforceable because Zaytsev was terminated without cause.

It is in fact the law that, "an employee's otherwise enforceable restrictive covenant is unenforceable if the employee has been terminated involuntarily, unless the termination is for cause." *In re UFG Int'l, Inc.*, 225 B.R. 51, 55 (S.D.N.Y. 1998). *See also Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 48 N.Y.2d 84, 89 (1979). The NDA does not include a definition of "for cause" termination – unsurprisingly, given that there is no indication that Zaytsev's employment was anything but at-will. In the absence of any contractual definition of "cause," the trier of fact can simply apply the most natural meaning of the phrase: whether Zaytsev was fired for an articulable and defensible reason relating to the performance of his duties at Stanacard. *See Friedman v. State*, 24 N.Y.2d 528, 540 (1969) (holding that the phrase "for cause" "clearly means ... some cause affecting or concerning the ability or fitness of the incumbent to perform the duty imposed upon him").

Stanacard identifies emails in the record that create a genuine issue of material fact as to whether Zaytsev was terminated for cause. While Choupak's email terminating Zaytsev does not specify a reason for the termination, email correspondence in the months leading up to Zaytsev's termination reveal that Choupak was increasingly unhappy with Zaytsev's work. Choupak reprimanded Zaytsev for failure to submit reports in a timely manner, for not showing up to work or for showing up late, and for his overall job performance. *See* Choupak Decl. Ex. A. This correspondence creates a genuine issue of material fact as to whether Zaytsev was fired "for cause," namely, poor performance.

The Rubard Defendants' motion for summary judgment dismissing Count 5 is denied.

**IX.    The Rubard Defendants' Motion for Summary Judgment Dismissing Count 7 (Breach of Fiduciary Duty Against Zaytsev) is Denied**

"Under Delaware law, a breach of fiduciary duty claim has two elements: (1) the existence of a fiduciary duty, and (2) the breach of that duty." *KDW Restructuring & Liquidation Servs. LLC v. Greenfield*, 874 F. Supp. 2d 213, 221 (S.D.N.Y. 2012).   Delaware courts "generally recognize that a fiduciary relationship will arise where one person reposes special confidence in another, or where a special duty exists on the part of one person to protect the interests of another, or where there is a reposing of faith, confidence, and trust, and the placing of reliance by one person on the judgment and advice of another." *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1058 (Del. Super. 2001) (internal quotation marks and citation omitted).

The parties do not dispute that Zaytsev, as a result of his employment relationship with Stanacard, owed the company a fiduciary duty.   Rather, the Rubard Defendants argue that (1) Zaytsev did not form Rubard until after the non-competition clause of the NDA – which lasted one year – had expired, and (2) there is no evidence that Zaytsev "neglected his duties" or bought personal items with Stanacard money during his tenure at the company. Rubard Br. at 24-25.

Stanacard does not dispute that Zaytsev did not form Rubard until after the expiration of the non-competition clause of the NDA. Instead, Stanacard argues that Zaytsev "abused corporate credit card privileges, neglected his duties, misrepresented his status as a member of Stanacard to corporate counsel…misappropriated Stanacard's property, induced Palatkevich to create CentMobile.com and aided and abetted him and Dzerneyko in setting up CentMobile.com as a competitor to Stanacard." Pl. Opp. to Rubard at 25.

As discussed above, *supra* at 43, emails appended to the Choupak Declaration create a genuine issue of material fact as to whether Zaytsev's poor performance at his job caused

44

Choupak to terminate his employment. But unfortunately for Plaintiff, evidence of poor performance is insufficient to create a genuine issue of material fact as to whether Zaytsev breached a fiduciary duty. Choupak criticized Zaytsev's work performance, suggesting that he was engaging only in "routine" tasks and chastising Zaytsev for failure to provide prompt reports of his work product. Choupak may genuinely have felt that Zaytsev was a poor employee, but that, on its own, does not create a genuine issue as to whether Zaytsev violated any "special duty" he had to protect Stanacard's interests.

Plaintiff points to not a scintilla of evidence to support its contention that Zaytsev abused his corporate credit card. Plaintiff has appended to the Choupak Declaration a 56-page document containing American Express credit card statements in Zaytsev's, Romanov's and Palatkevich's names, but offers no explanation as to why any of the charges are fraudulent! *See* Choupak Decl. Ex. B. Nor is there any evidence in the record about the parameters of how Zaytsev was permitted to use his corporate credit card. The American Express statements, without more, do not create a genuine issue of material fact as to whether any charges were inappropriate.

As for whether Zaytsev "misrepresented" his status as a Member of Stanacard, as detailed in the decision disposing of the summary judgment motion in the Choupak Case, there is a genuine issue of material fact as to whether Zaytsev was in fact, a Member of Stanacard. *See* Choupak SJ Order at 28-29. Whether he was or was not a member will be resolved at trial in the Choupak Case, and the jury's decision will collaterally estop him and Stanacard in this lawsuit. There may in fact not have been any misrepresentation at all, and Zaytsev may have entertained a good faith belief that he was a Member of Stanacard. The fact that he signed a Joinder Agreement giving him a 10% interest in the company would certainly support such an inference.

45

However, until this issue is decided, there is a genuine issue of material fact as to whether Zaytsev misrepresented his status at Stanacard to try and allocate himself a 10% interest in the company. As a result, summary judgment dismissing the claim for breach of fiduciary duty against Zaytsev must be denied.

Finally, Stanacard argues that Zaytsev "induced" Palatkevich to create CentMobile. Plaintiff's brief is rife with conclusory allegations as to Zaytsev's role in CentMobile prior to Rubard's formation. But it is devoid of any evidence to support those allegations. Rather, the evidence in the record establishes that Zaytsev's participation in CentMobile commenced in December 2010, when he formed Rubard. At that point, he was long gone from Stanacard, and the NDA's non-competition clause, which kicked in when Zaytsev was terminated in November 2009, had expired. Zaytsev owed Stanacard no fiduciary duty at that time.

Because there is a genuine issue of material fact as to whether Zaytsev misrepresented his ownership of Stanacard to counsel, the Rubard Defendants' motion for summary judgment dismissing Count 7 is denied.

## CONCLUSION

This case will be tried on October 3, 2016. The Final Pre-Trial Conference will be held on September 23, 2016 at 2:00pm. Counsel should read my rules and be prepared to obtain rulings on all objections to exhibits that are proposed (in the Pre-Trial Order) to be entered into evidence at trial. Make sure to bring the exhibits (including copies for the court) and arguments, because all objections will be ruled on at the conference.

For the foregoing reasons, Defendants' motions for summary judgment are granted in part and denied in part. The Clerk of the Court is directed to remove Docket Nos. 190 and 197 from the Court's list of pending motions.

Dated: February 3, 2016

_____
U.S.D.J.

BY ECF TO ALL COUNSEL