**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
STANACARD, LLC,                              :          **Case No. 1:12-cv-05176 (CM)**
                              Plaintiff,     :

        -against-                            :

RUBARD, LLC D/B/A CENTMOBILE,
ALEKSANDR PALATKEVICH, ARTUR                 :
ZAYTSEV & ALEXANDER DZERNEYKO,

                              Defendants.    :
---------------------------------------------------------X

**MEMORANDUM IN OPPOSITION TO**
**MOTION IN LIMINE TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF**
**TERENCE L. GRISWOLD**

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ...................................................................................................... i

**ARGUMENT** ......................................................................................................................... 2

    **Griswold's Calculation of Damages** ....................................................... 7

    **Griswold's Methodology** ...................................................................... 11

    **Sufficiency of Data** .............................................................................. 14

**CONCLUSION** ...................................................................................................................... 19

# TABLE OF AUTHORITIES

## Cases

Arista Records, LLC v. Lime Group, LLC 2011 WL 1674796 (S.D.N.Y. 2011) .................... 2

Baker v. Urban Outfitters, Inc., 254 F.Supp.2d 346 (S.D.N.Y. 2003).................................... 18

Brown v. Columbia Recording Corp., 2006 WL3616966 (S.D.N.Y. 2006) ......................... 18

Complex Systems, Inc. v. ABN Ambro Bank N.V., 2013 WL 5970065 (S.D.N.Y. 2013)...... 3

Computer Associates Intern., Inc. v. Altai, Inc., 982 F.2d 693 (2nd Cir. 1992) ...................... 8

Country Road Music, Inc. v. MP3.com, Inc., 279 F.Supp.2d 325 (S.D.N.Y. 2003) .............. 18

Dow Jones & Co., Inc. v. Real-Time Analysis & News, Ltd., 2014 WL 4629967 (S.D.N.Y.
    2014)................................................................................................................................ 4

Gaylord v. United States, 777 F.3d 1363 (Fed. Cir. 2015) .................................................... 8

In Design v. K-Mart Apparel Corp., 13 F.3d 559 (2nd Cir. 1994) .......................................... 3

ITT Corp v. Xylem Group, 963 F.Supp.2d 1309 (N.D.Ga. 2013).......................................... 9

LinkCo, Inc. v. Fujitsu Ltd., 232 F.Supp.2d 182 (S.D.N.Y. 2002)...................................... 4, 7

Mackie v. Rieser, 296 F.3d 909 (9th Cir.2002) .................................................................... 3

Mager v. Brand New Sch., 2004 WL 2413978 (S.D.N.Y. 2004) ........................................... 3

On Davis v. The Gap, Inc., 246 F.3d 152 (2nd Cir. 2001)........................................... 2, 3, 7, 9

Polar Bear Prods., Inc. v. Timex Corp., 384 F.3d 700 (9th Cir. 2004)................................ 3, 4

R.F.M.A.S. v. So, 2010 WL 4341331 (S.D.N.Y. 2010) ......................................................... 4

Semerdjian v. McDougal Littell 641 F.Supp.2d 233 (S.D.N.Y. 2009) ................................ 3, 7

Sheldon v. Metro–Goldwyn Pictures Corp., 309 U.S. 390, 408 60 S.Ct. 681 (1940) ............ 10

Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc., 188 F.3d 955 (2nd Cir. 1997)........ 7

SR Int'l. Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC, 467 F.3d 107 (2nd Cir.2006) ... 2

**Statutes**

17 U.S.C. §504.............................................................................................................. 7

17 U.S.C. §504(a) ......................................................................................................... 2

17 U.S.C. §504(b). ................................................................................................... 2, 3

**Other Authorities**

Shannon P. Pratt & Alina V. Niculita, <u>Valuing a Business: The Analysis and Appraisal of</u>

<u>Closely Held Companies</u> ........................................................................... 11, 12

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X
STANACARD, LLC,                                    :        **Case No. 1:12-cv-05176 (CM)**


                                    Plaintiff,      :                ECF CASE

-against-                                          :

RUBARD, LLC D/B/A CENTMOBILE,
ALEKSANDR PALATKEVICH, ARTUR
ZAYTSEV & ALEXANDER DZERNEYKO,

                                    Defendants.     :
----------------------------------------------------------------X

## MEMORANDUM IN OPPOSITION TO
## MOTION IN LIMINE TO EXCLUDE THE EXPERT REPORT AND TESTIMONY
## OF TERENCE L. GRISWOLD

Plaintiff respectfully submits this memorandum of law in opposition to the motion of

Rubard, LLC and Artur Natan Zaytsev ("Rubard"), seeking to preclude – in the wake of this

Court's decision and order dated February 3, 2016 – the report and testimony of Stanacard's

expert, Mr. Griswold, Managing Director of Empire Valuation Consultants, LLC, regarding

the damages Stanacard claims to have suffered due to defendants' alleged (i) infringement of

Stanacard's copyright & (ii) theft of Stanacard's trade secrets. Memorandum of Law in

Support of Defendants' Motion in Limine ("R Memo") & Ex. 1 (Expert Report of Empire

Valuation Consultants, LLC, dated May 7, 2015) ("Griswold Report").

Defendants do not challenge Griswold's qualifications as an expert witness. Rather,

they seek to exclude his report and testimony as conclusory, i.e., (i) "lacking in any sort of

identifiable recognized methodology," and (ii) "no[t] based on reliable data or assumptions,"

R Memo, p.1. On this record, however, Mr. Griswold's report is based on (i) well-known

methodologies and (ii) the extraordinary limited data provided by defendants. Infra.

1

Moreover, defendants' critique of Mr. Griswold's report appears to go more towards the weight of his expert testimony than its admissibility. Arista Records, LLC v. Lime Group, LLC 2011 WL 1674796 at * 13 (S.D.N.Y. 2011) *citing* SR Int'l. Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC, 467 F.3d 107, 134 (2nd Cir.2006) ("gaps or inconsistencies" in expert testimony "go to the weight of the testimony not to its admissibility"). Since Mr. Griswold's testimony is likely to be useful to the trier of fact – charged with, *inter alia*, calculation of Stanacard's actual damages – defendants' motion ought to be denied.

## ARGUMENT

In this case, only two (2) surviving causes of action, i.e., copyright infringement and misappropriation of trade secrets, remain to be tried.  On this record, Stanacard "owns a valid copyright in the relevant code [implementing the '156 patent])," D.I. 251, p.23, while Rubard's business is based (allegedly) "on a copy of Stanacard's original copyrighted work," misappropriated by Zaytsev and Palatkevich. *See generally* Declaration of Lisia L. Leon in Support of Defendants' Motion in Limine to Exclude the Expert Reports and Testimony of Dr. Darren R. Hayes, Exs. 1-3 ("Hayes Reports"). (Stanacard engaged Dr. Hayes to render his expert opinion on defendants' alleged infringement of Stanacard's copyright.)

The putative infringer is liable for actual damages and the infringer's additional profits, if any, over and above actual damages. *See* 17 U.S.C. §504(a) (imposing liability for, *inter alia*, "the copyright owner's actual damages and any additional profits of the infringer"). (Stanacard is not entitled to statutory damages. D.I. 251, pp. 23-4.)  *See also* 17 U.S.C. 504(b) ("The copyright owner is entitled to recover the actual damages suffered … as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages."); On Davis v.

The Gap, Inc., 246 F.3d 152, 171 (2nd Cir. 2001) (Actual damages can be calculated as "fair market value of a license covering the defendant's infringing use," i.e., the "reasonable license fee on which a willing buyer and a willing seller would have agreed for the use taken by the infringer," as determined from an *ex ante*, or pre-infringement perspective).

To recover damages for copyright infringement, Stanacard must show that at least some portion of Rubard's gross revenue is causally related to Rubard's infringement. 17 U.S.C. §504(b). ("In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work."); Polar Bear Prods., Inc. v. Timex Corp., 384 F.3d 700, 710 (9th Cir. 2004) *quoting* Mackie v. Rieser, 296 F.3d 909, 914 (9th Cir.2002) (17 U.S.C."§504(b) does not differentiate between 'direct profits'—those that are generated by selling an infringing product—and 'indirect profits'—revenue that has a more attenuated nexus to the infringement.'"); Complex Systems, Inc. v. ABN Ambro Bank N.V., 2013 WL 5970065 at *2 (S.D.N.Y. 2013) *quoting* On Davis, supra ("The term 'gross revenue' must be construed as 'gross revenue reasonable related to the infringement, not unrelated revenues.'")

Stanacard's burden is thus limited. Mager v. Brand New Sch., 2004 WL 2413978 at *4 (S.D.N.Y. 2004) ("A copyright owner bears the initial burden of demonstrating a causal nexus between the infringement and the appropriate gross revenues."). *See also* Semerdjian v. McDougal Littell 641 F.Supp.2d 233, 247 (S.D.N.Y. 2009) *quoting* In Design v. K-Mart Apparel Corp., 13 F.3d 559, 564 (2nd Cir. 1994) (plaintiff's burden is limited because "the copyright holder cannot realistically be required to offer … facts and figures … [on] a subject exclusively within the infringer's knowledge.").

3

Once met by plaintiff, <u>supra</u>, the burden switches to the putative infringer to prove that at least some portion of its profits is not due to its infringement. <u>Polar Bear Prods., Inc., supra</u>, at 711 (9th Cir. 2004) (to recover indirect profits "(1) the copyright claimant must first show a causal nexus between the infringement and the gross revenue; and (2) once the causal nexus is shown, the infringer bears the burden of apportioning the profits that were not the result of infringement.")

Damages for misappropriation of trade secrets is measured either by plaintiff's losses, the profits unjustly received by defendant or a reasonably hypothetical royalty rate. *See*, <u>e.g., Dow Jones & Co., Inc. v. Real-Time Analysis & News, Ltd.</u>, 2014 WL 4629967 at *6 (S.D.N.Y. 2014) ("In [a] cause of action [for the] … misappropriation of trade secrets, a plaintiff's damages are typically calculated based on the revenue plaintiff would have made but for the defendant's wrongful conduct, or alternatively, the profits unjustly received by the defendant."); <u>LinkCo, Inc. v. Fujitsu Ltd.</u>, 232 F.Supp.2d 182, 185-6 (S.D.N.Y. 2002) ("[I]n cases where it is difficult to assess the amount of profits that had been diverted from plaintiff or where such amounts would not adequately compensate the plaintiff, courts have found that a plaintiff can recover the value of a 'reasonable royalty' – an amount that attempts to approximate 'what the parties would have agreed to as a fair licensing price at the time that the misappropriation occurred.") [*internal citations omitted*].

At trial, Stanacard – not Mr. Griswold – will have to prove that Rubard's source code infringed upon Stanacard's source code and that defendants misappropriated Stanacard's trade secrets and thereby caused damages to Stanacard. Such a determination may well be within the knowledge and experience of a typical lay juror. *See* <u>e.g.</u>, <u>R.F.M.A.S. v. So</u>, 2010 WL 4341331, at *19 (S.D.N.Y. 2010) (excluding expert testimony on infringement where a

4

juror without special background or experience in the industry could have employed common sense to perform the same analysis as expert). Here, Dr. Hayes's testimony is likely to provide direct evidence of infringement, misappropriation of trade secrets and damages, while Mr. Griswold's testimony may well provide circumstantial evidence by way of the strong correlation between defendants' activities and Stanacard's damages. *Cf.* R Memo p.9 ("Griswold's Report … cites to no evidence of lost sales directly caused by Rubard defendants' alleged infringement.")

According to Palatkevich, Rubard's method for placing long-distance phone calls is substantially similar, if not identical, to Stanacard's method. *Compare* Declaration of Igor Krol, dated February 16, 2016 ("Krol Decl"), Ex. A (Palatkevich Tr.), p.24 ("Q. So having gone through these steps on the Web site, I get a local number, and I can use my phone, dial a local number, and lo and behold, the telephone rings someplace else, right? A. Well, two ways how you can dial. The first way you can dial the access number, and then with the tone you would have to dial your number in Uzbekistan. Q. And that's Stanacard, right? A. Yes, or you can program your address book. Q. In the phone? A. In the phone and at the Web site. You would need to enter the numbers you want to dial. Q. Yes, and what would happen then? A. So you would dial the local number, you'll get connected instantly.") *to* id., p.138 ("Q. So whatever you did in 2003, you used the same approach for call routing in a Stanacard platform, right? A. Yes. Q And then you used the same approach to the Centmobile routing? A. Yes."); id. p.148 ("Q. So would it be fair to say that once I call you [Centmobile] from my phone that has a caller ID and dial the local access number that you assigned to me, and once you check that I have enough money in my account, nothing else is required to connect me to my destination in Uzbekistan? A. For you, nothing.")

Palatkevich admittedly took Stanacard's software and incorporated it, with minimal modifications, into Rubard's. <u>Krol Decl.</u>, <u>Ex.</u> A (<u>Palatkevich Tr</u>), p.139 ("[W]hatever was developed for Stanacard, it was developed for Centmobile.") According to Dr. Hayes, Rubard's source code, the lifeline of its business, is a literal copy, with some modifications, of Stanacard's source code. *See generally* <u>Hayes Reports</u>. Such evidence may lead a jury reasonably to conclude that Stanacard's software, misappropriated by Palatkevich and Zaytsev, generated all or substantially all of Rubard's income.

On this record, Palatkevich at all relevant times had unfettered access to Stanacard's source code. *See* <u>Krol Decl</u> <u>Ex.</u> A (<u>Palatkevich Tr</u>) p.60 ("Q: [T]hat modified [Stanacard's source] code is kept someplace, right. A. Yes. Q: And that now brings me to the point of where was it kept? A. It was kept on Stanacard servers and inside of my development environment.") & <u>id.</u>, p.62 ("Q: And where was the other version – not version, another copy running, which is referred to as my development environment? Where was that? A. In my office. Q. In your office? A. Yes. Q. On what kind of piece of equipment if any, maybe several that it was kept? A. Well, it was Think Pad notebooks and some test servers. Q. And where were these pieces of equipment located? A. In my office in Brooklyn."). *See also* <u>D.I.</u> 251, pp.36-7 ("'In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that [misappropriation] is more probable than not' … Stanacard has done so here.").

Defendants themselves appear to concede that some portion of Rubard's income is attributable to Stanacard's technology. *See* <u>Krol Decl</u> <u>Ex.</u> B (<u>Expert Report of Kimberly Jane Schenk</u>, dated July 6, 2015), Schedule 5 (Pinless CentDial Minutes as a Percent of Total Rubard Minutes, 2011 – July 1, 2015) & <u>D.I.</u> 231 (<u>Joint Pre-Trial Order</u>), DX 260 & ¶208

("[L]ess than 60% of Rubard's revenues are derived from calls made using the allegedly patented/copyrighted system and more than 44% of Rubard's income is derived from calls that do not infringe."). This document – not produced in discovery – appears to have been created for litigation purposes and based purely on defendants' self-serving *ipse dixit*.

### Griswold's Calculation of Damages

Stanacard hired Empire to help Stanacard quantify damages caused by defendants' alleged (i) infringement of its copyright and (ii) misappropriation of its trade secrets. 17 U.S.C. §504 "provides for the recovery of both the infringer's profits and the copyright owner's 'actual damages.'" On Davis, supra, at 159 & id., at 166-7 (Actual damages are measured as "the fair market value of a reasonable license fee" while "owner's entitlement to infringer's profits is limited to the profits attributable to infringement."); Semerdjian, supra, at 243 ("for direct competitors, a defendant's gain from [copyright] infringement is likely approximately equal to the plaintiff's actual damages, because the copyright holder would have lost sales directly to the infringer."). *See also* On Davis, supra, at 158 ("The existence of damages suffered is not an essential element of a claim for copyright infringement.")

Damages for misappropriation of trade secrets are measured by plaintiff's losses, the profits unjustly received by defendant or a reasonably hypothetical royalty rate. LinkCo, Inc. v. Fujitsu Ltd., 232 F.Supp.2d 182, 185-6 (S.D.N.Y. 2002). Thus, the measure of damages appears to be the same for both causes of action. *See* Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc., 188 F.3d 955, 969-70 (2nd Cir. 1997) (award based on defendant's profits for misappropriation of trade secrets, while ultimately set aside as coextensive with copyright infringement damages, was appropriate measure of damages because it approximated plaintiff's lost profits where plaintiff and defendant were competitors).

Defendants challenged Griswold's calculation of damages on several grounds. Thus, they claimed that Griswold did not assign a separate value to the copyright license or account for damages caused by Rubard's infringement of Stanacard's copyright, but rather assumed, *sub silentio*, that no one would have licensed both the patent and the copyright. (At the time Griswold wrote his report, the '156 patent was still valid.) *Cf.* R Memo, p.2 ("Griswold's failure to use a hypothetical negotiation between a willing buyer and willing seller as the standard for setting a royalty rate is fatal to his analysis.").

Stanacard has never licensed its copyrighted software and, on this record, neither has Rubard. *Accord* R Memo, p.5 ("[T]here is no evidence that Stanacard has ever licensed its software or any other copyrights."). Griswold thus could not use prior practice of licensing copyright to determine a reasonable royalty rate. *Cf.* R Memo, p.7 *quoting* Gaylord v. United States, 777 F.3d 1363 (Fed. Cir. 2015) ("Past arms-length licensing practices by [Stanacard] or [Rubard] for similar uses … may [have] be[en] useful.") & id., p.5 ("[T]here is no evidence that Stanacard has ever licensed its software, or any other copyrights.").

Stanacard had yet to file for copyright at the time Stanacard licensed its patent to eight (8) of its competitors, some of whom by that time had created their own software and had no further use for the one created by Palatkevich and others for Stanacard. They had the software; to use the software, they needed to license the patent. Put differently, their cost of legitimate entry into this niche market was the cost of the license of Stanacard's patent.

Suppose Stanacard – and a multitude of others – ignored Judge Walker's suggestion and did not register their computer programs with the U.S. PTO. *See* Computer Associates Intern., Inc. v. Altai, Inc., 982 F.2d 693, 712 (2nd Cir. 1992) ("Patent registration, with its exacting up-front novelty and non-obviousness requirements, might be the more appropriate

rubric of protection for [computer programs]"). Then a putative entrant into this niche market would have been unable to create its own software for Stanacard's method of making cheap international calls via antiquated mobile telephones. (Stanacard's website would not have been enough, and the patent description would have been missing.) The only way to enter this niche market would have been to purchase a software license from Stanacard and protect such license as a trade secret from the outside world and unfaithful employees.

Put differently, the cost of entry into this market to compete head-on with Stanacard and its licensees would have been the same. Stanacard did not care what label was on the license to compete with Stanacard. (A rose by any other name is still a rose.) Either license did no more than allowed the holder to compete with Stanacard by using Stanacard's proprietary technology. That is why the value of either license ought to be – at least in theory – the same, and that is why Griswold did not calculate the value of the copyright separately. No one would have bought both! Krol Decl., Ex. C (Griswold Tr.), p.36 ("I applied a standard approach … to ensure they do not double count the royalty for the patent component.") *But see* R Memo, p.8 ("[Griswold's] report does not address how the patent license agreements are comparable to a hypothetical copyright license agreement.")

In the absence of an established marketplace value for Stanacard's copyright, this Court must determine a hypothetical rate "at the time that the misappropriation occurred." Supra, p. 4. *See also* On Davis, supra, at 166 (determining fair market value of a reasonable license fee "requires the court to explore the counterfactual hypotheses of the contracts and licenses the plaintiff would have made absent the infringement and the costs associate with them"). ITT Corp v. Xylem Group, 963 F.Supp.2d 1309, 1329 (N.D.Ga. 2013) ("The reasonable royalty theory has ... been a method to estimate hypothetical royalty amounts in

the absence of an established royalty."); <u>Sheldon v. Metro–Goldwyn Pictures Corp.</u>, 309 U.S. 390, 408 60 S.Ct. 681, 84 (1940) (extending the "reasonable royalty" theory of damages to copyright cases). This hypothetical negotiation between a putative licensee and Stanacard ought to have taken place "at the time that the misappropriation occurred," <u>i.e.</u>, in 2009. At that time, however, any such hypothetical licensee would have known all there was to know about the '156 patent and the method of making long distance telephone calls spelled out therein. That is why, in an arm's-length negotiation, Rubard's software development costs cannot furnish a baseline for determining a reasonable royalty. (Besides, Rubard did not incur any development costs; Palatkevich had the code, kit and caboodle.)

Unlike Rubard, Stanacard had spent years developing a working system improved by Palatkevich in 2006. Thus, Stanacard's costs are an accurate indicator of what it could cost to independently develop software, while Rubard's costs are not. *Compare* <u>Krol Decl.</u>, <u>Ex</u>. A (<u>Palatkevich Tr</u>), p.18 ("Q. From what I understand you to say, is that there was something called Stanacard project, right? A. Yes. Q. And that was there at Intermedia before you turned up, if you did, May/June 2006, right? A. Yes, existed before."); <u>id.</u>, p.25 ("Q. And was that system that you just described operational when you turned up May/June 2006?  A. It was somewhat operational."); p.17 ("Well, Michael asked me to take over, you know, take the Stanacard project and so, quote unquote, make it work. Q. And that was May/June 2006, right? A. Yes.") & p.57 ("Q. October 2006. So we called it from your past -- A. So that was the date when I migrated the data important to the new one and pushed the button start.") *to* <u>id.</u>, p.135 ("It took about six, seven months to do. Q. I got it. Now, took about six, seven months to write the source code for the Web site of your Centmobile Retail Platform? A. Web site and other stuff. Q. What's the other stuff? A. To make the system work.")

**Griswold's Methodology**

Defendants' counsel questioned Griswold extensively about the methodologies he employed and the documents he reviewed in preparing his expert report.  *See* Krol Decl., Ex. C (Griswold Tr.), pp.29-37. While Mr. Griswold explained at great length the assumptions and facts underlying his calculations and mentioned textbooks by Shannon P. Pratt, a well-known authority on business valuation, as a source of reliable and recognized methodologies, defendants still claim that Stanacard "cannot demonstrate that Griswold's opinions are based on a relevant and reliable methodology and data." R Memo, p.5. *But see* Krol Decl., Ex. C (Griswold Tr), pp.30-1 ("I think in terms of there is a recognized or is there a methodology, yes, there is a methodology, you would tend to qualify the revenues – I'm sorry the damage[s] related, to quantify the incremental profits lost because of the lost revenue. Q. And is that written down somewhere? A. There would be textbooks that would address that … prepared by Shannon Pratt."); id., pp.34-5 ("Q: Are you familiar with the phrase incremental lost profits? A: Yes. Q: And is there a reliable and recognized methodology to determine how to calculate damages for incremental lost profits? … A: Anytime you're valuing a financial asset, being intellectual property or intangible, there are three basic approaches, market, income and asset approach."); id., p.39 ("I reviewed documents pertaining to Stanacard. I reviewed documents pertaining to Rubard. Principally financial data. Looked at prior licensing agreements and other documents listed in the report.").

Mr. Griswold – who has spent decades conducting business valuations – relied primarily on the "income method" as the basis for his report. *See* Krol Decl., Ex. D (Excerpts from Shannon P. Pratt & Alina V. Niculita, Valuing a Business: The Analysis and Appraisal of Closely Held Companies ("Pratt"), p.1024) ("Economic damages often require or may

benefit from the use of business valuation methods. Both disciplines rely heavily on the income approach method.") Mr. Griswold calculated incremental lost profit above royalty in accordance with the sales projection or the "but-for method," <u>Griswold Report</u>, pp. 9-10, whereby "operations are projected during the damage period absent, <u>i.e.</u>, but for, the alleged effects of the defendant's actions. The returns suggested by the model are then compared with the actual results realized by the company during the period." <u>Krol Decl</u>., <u>Ex</u>. D (<u>Pratt</u>, p. 1025). *See also* <u>id</u>., <u>Ex</u>. C (<u>Griswold Tr.</u>) pp.35-6 ("When you are looking at lost profits, one has to be able to quantify the lost income and the profitability related to that … I was breaking apart the overall damages from two components, damages, being the patent and the other, intellectual property that are in a bundle sense … intellectual property being the copyright.").

     Yes, Mr. Griswold assumed that, "but for the alleged misappropriation [by Rubard], Stanacard would have captured between 50-75% of Rubard's gross revenues."  He explained his basis for this assumption. *See* <u>Krol Decl</u>., <u>Ex</u>. C (<u>Griswold Tr.</u>), pp.208-9 ("Q: In your analysis also on page 10, for 2013-4 you lowered the 75% number to 50%, correct? Why did you do that? A: Because the predatory pricing was aggressive in 2012. The predatory pricing subsided in 2013."). *See also* <u>id</u>., pp. 204-5 ("Q: How did you come up with the 75% capture ratio? … A: I took a judgment call … That was my judgment based on the analysis I just stated.") *But see* <u>R Memo</u>, p.14. (Griswold's assumption is "arbitrary," and unsupported by "any evidentiary documentation of misappropriation by Rubard.").

     Griswold calculated impairment of value by using the combination of the "but-for method," <u>supra</u>, and the income capitalization (Gordon Growth) model. <u>Krol Decl</u>., <u>Ex</u>. D (<u>Pratt</u>, p. 242) ("The direct capitalization model assumes that the base level of normalized

economic income to be capitalized is the expected income in the period immediately following the effective valuation date. If the normalized economic income for the period immediately preceding the effective valuation date is considered a reasonable base level from which to project sustainable growth, the Gordon growth model version of the capitalized economic income method is appropriate."). *Compare* R Memo, p.16 ("[T]he gross market erosion calculations in his Report are also not based on any reliable data or methodology.") *with* Krol Decl., Ex. C (Griswold Tr.), p.224 ("The capitalization methodology for the lost income is very appropriate.")

Griswold calculated damages due to gross profit impairment, Griswold Report, pp.8-9, employing the "before and after method," whereby "economic income is estimated during the damage period based upon results (1) attained prior to the alleged damaging acts and/or after the effects of the alleged acts have subsided and either or both of these is compared with results during the period of the effect of the alleged acts.

The success of this method depends, of course, on the ability of the expert to establish and support a proven historical financial record for the subject property so that operations, preceding and succeeding the event are able to serve as the damage bookends clearly illustrating the effects of the interruption or the violation." Krol Decl., Ex. D (Pratt, pp.1024-5). *Compare* R Memo, p.18 (Griswold's conclusions on impairment of value are "without any analysis or citation to any evidence that Stanacard's lost profits will continue into perpetuity," "based on very little financial data," etc.) *with* Krol Decl., Ex. C, (Griswold Tr), p.119 ("Q: How did you determine that the gross profit impairment in 2012 was $566,000? A: I looked at the loss and growth margin for the year and I found that to be as stated on page eight.")

13

**Sufficiency of Data**

Stanacard did not – and could not – learn anything about Rubard's profits because Rubard (i) is a small, closely held private company; (ii) does not disclose its financial statements and (ii) utterly failed to comply with Stanacard's discovery requests. Thus, and to the extent that Mr. Griswold's opinion is founded on "very little data," R Memo, p.1, defendants have no one but themselves to blame. (Defendants' discovery abuses are well documented. *See* D.I. 173 (Stanacard's Memorandum in Support of Motions for Sanctions), D.I. 174 (Declaration of Dr. Darren Hayes) & D.I. 175 (Declaration of Igor Krol).

With a dearth of information about Rubard's gross revenues, the proportion of gross revenues attributable to alleged infringing vs. non-infringing activities, profits, etc., Mr. Griswold did the only thing he could, i.e., he calculated actual damages upon the limited and incomplete information at his disposal. *See* Krol Decl., Ex. C (Griswold Tr), pp.50-1 ("I gave an opinion of a reasonable range for the damages and lost profits … I do know that there are components missing, so that the ultimate damages, I believe, are higher.").

At the time, Mr. Griswold had no data for the years 2011, 2014 & 2015. Subsequent to the submission of his report on May 7, 2015, defendants produced previously undisclosed documents relating to Rubard's operations and activities on four (4) separate occasions: May 21, 2015 (RUBARD SP 1678-26543); June 18, 2015 (RUBARD SP 26454-26486); July 2, 2015 (RUBARD SP 26512-26921) and July 22, 2015 (RUBARD SP 26922-5). Krol Decl., Ex. F. The supplemental production provided more detailed and different financial data than that which had been available to Griswold while preparing his report, e.g., Rubard's profit and loss statements ("P&Ls"), balance sheets, gross and net revenue figures, etc., for 2011, 2014 and 2015, and further supported Griswold's opinions to the effect that defendants (i)

infringed upon Stanacard's intellectual property, possibly as early as January 1, 2011; (ii) had fully functional software that allowed them to conduct income-producing activity for at least two (2) full quarters prior to April 2011 even though defendants claimed elsewhere, e.g., in documents filed with the FCC, that they had commenced business in April 2011, and (iii) engaged in targeted predatory pricing policies which undercut the Stanacard's profitability; namely, in a price-sensitive commercial environment, Rubard's below-cost and below-market pricing and ramped-up marketing and promotions efforts, – commencing as early as 2011, peaking in 2012 and continuing through 2014 – effectively eroded the Stanacard's gross profits and customer base: albeit at the cost of self-cannibalization. Krol Decl., Ex. E (E-mail from Alexander Dzerneyko dated September 25, 2012 [D.I. 231, PX 118]).

Mr. Griswold did identify Stanacard's customer base. Krol Decl., Ex. C (Griswold Tr) p.61 ("Stanacard targeted individuals in their geographic area that they're servicing, from a small group of immigrant, low income immigrant individuals, that were looking to communicate back to their countries where they had emigrated from or had family … My recollection was the Greater New York City area was the primary geographic territory."); id., pp.146-7 ("[T]he market from their niche of servicing low-income immigrant people in the specific geographic territories, making calls to specific countries").

The overall market share of the relevant niche players is readily ascertainable from Griswold's data. In 2012 Stanacard had $12 million in sales; Rubard, $6 million; Stanacard licensees, $4 million in revenue, for a total market of some $22 million and market shares of 54.5%, 27.3% and 18.2%, respectively. *Compare* R Memo, pp.12 & 15 (Griswold did not (i) review documents "related to companies in the wider relevant industry other than Stanacard," (ii) state "Rubard's actual market shares in the alleged "niche" market," (iii) "define the

market," "other than a few companies that entered into license agreements with Stanacard," and (iv) provide "information about how many international long distance telephone companies serve this alleged market niche.") *with* <u>Krol Decl.</u>, <u>Ex.</u> C (<u>Griswold Tr</u>) p.60 ("Q: Did you or your firm do any research about any of these other niche players. A: I believe that those companies are private and therefore, there was no information – I believe for the valuation report, we had looked for information on others, but were not able to obtain anything.").

In fact, Stanacard's market niche was so small and specialized, <u>supra</u>, that Stanacard sensed the presence of a new competitor – without knowing its identity – by virtue of an immediate – and significant – drop in its revenues. <u>Krol Decl.</u>, <u>Ex</u>. C (<u>Griswold Tr</u>), p.175 ("Stanacard became aware of increased competition from a company that they ... didn't know ... was Rubard, that this C[ent]Mobile and they perceive them as a competitor going after their specific [market]."); <u>id.</u>, p.70 ("[T]hey became aware of that, there was an increase in churn and therefore, it competed – something changed in the competitive environment.").

A pushcart – ubiquitous in the streets of New York – may provide a useful analogy to Stanacard's predicament in the face of Rubard's competition within Stanacard's small niche market. If pushcart 1 operates on the corner of Worth and Centre Streets, the appearance of another pushcart outside of Radio City Music Hall will not cause a blip to register on the radar of the overall universe of New York City street vendors or even pushcart 1.  However, when another pushcart selling the same shish kebab will appear on the street corner opposite pushcart 1 and proceed to sell his wares below cost, pushcart 1 will immediately feel the economic effect of such competition – as a drop in revenue and customers – and will have to redouble its efforts to stay in business and compensate for its losses.

16

This is exactly what happened in this case, and this is why Stanacard, a small fish in a veritable ocean of telecoms services providers, instantly felt the presence of a competitor in its own backyard. *See* <u>Krol Decl</u>., <u>Ex</u>. C (<u>Griswold Tr</u>) pp.79-80 ("The evidence that I have [that Rubard was actively going after Stanacard's clientele] is the numbers themselves, both from Stanacard and Rubard … Stanacard margins dropped materially and … Rubard launched in 2012 in its pricing services at below its cost. So [Rubard] was operating at a negative growth … Rubard was pricing itself at a loss and that corresponded with … Stanacard, who responded at the time because they were gauging the market … [being] forced to cut their margin … Their actions enabled them to return the number of customers that they lost money from a margin standpoint."); <u>id.</u>, pp.96-8 ("[T]here was a markup on [Stanacard's] termination costs to – and continue with the promotion … [T]he gross margin declined … So they're [sic] termination costs is a percent of revenues, was materially changed. It had been 69% in 2010, 70% in 2011 and it jumped to 76.3% in 2012 … The markup is factual. These calls, their customers pre-paid and the markup is based on their – what they charge relative to their termination costs. The numbers are the numbers."); (<u>Griswold Report</u>), p.8 ("This predatory pricing and targeting of Stanacard's customer base, contributed to Stanacard's unprecedented large operating loss in 2012.").

New technological developments and free calling services, offered by multi-billion-dollar conglomerates, have yet to affect Stanacard's market niche. Stanacard customers can make free long distance calls by downloading Stanacard's "Keku App," but their intended call recipients cannot. If they could, Stanacard would have gone out of business along with Rubard and their competitors. That Stanacard, Rubard and their like are still in business is strong evidence that their customers, members of poor immigrant groups, cannot make use of

this technology because the recipients of their calls do not have the technology, <u>e.g.</u>, computers or even smart phones, to communicate for free. *See also* <u>Krol Decl</u>., <u>Ex.</u> C (<u>Griswold Tr</u>), p.172 ("The danger of the free calls to the countries where you have a more established telecommunication industry, that's why Stanacard and its customer base were a target, low income immigrants from specific countries, where the telecommunications competitiveness is not as great because of the lack of infrastructure.") In short, while technology no doubt will catch up in this market sector, it has not yet to do so.

This Court may or may not use Mr. Griswold's report and his testimony to calculate a royalty rate based on a hypothetical arm's-length negotiation. *Compare*, <u>e.g.</u>, <u>Brown v. Columbia Recording Corp.</u>, 2006 WL3616966 at *3 (S.D.N.Y. 2006) ("In some instances, courts have relied on expert testimony to determine the fair market value of a reasonable license fee.") *with* <u>Baker v. Urban Outfitters, Inc.</u>, 254 F.Supp.2d 346, 352-9 (S.D.N.Y. 2003) (evaluating but excluding testimony and report of plaintiff's expert and relying instead on plaintiff's past license fees in determining use of copyrighted work); <u>Country Road Music, Inc. v. MP3.com, Inc.</u>, 279 F.Supp.2d 325, 331 (S.D.N.Y. 2003) (excluding report and testimony of plaintiff's expert but concluding record may contain other evidence in support of actual damages claim).

Whether or not this Court does, <u>supra</u>, Mr. Griswold's report and his testimony will help the jury determine Stanacard's actual damages and understand the balance sheet and the line items peculiar to Stanacard's business, <u>e.g.</u>, termination and origination fees, promotional costs, <u>etc</u>. and how they factor in calculating financial ratios. *But see* <u>R Memo</u>, p.7 ("Mr. Griswold should not be able to present copyright damages figures derived from his perfunctory review of patent license agreements.")

## **Conclusion**

For the foregoing reasons, Stanacard respectfully requests this Court to deny Rubard's motion to preclude the report and testimony of Mr. Griswold.


Dated: New York, New York  
          February 16, 2016

Respectfully submitted,  
KROL & O'CONNOR  
Attorneys for Plaintiff  
320 West 81st Street  
New York, N.Y. 10024  
(212) 595-8009  
By:_____/s/_____  
     Igor Krol (IK 1068)